TREG R TAYLOR
ATTORNEY GENERAL
Ronald W. Opsahl (Alaska Bar No. NA20118)
Senior Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5232
Facsimile: (907) 279-2834
Email: ron.opsahl@alaska.gov

Attorney for the State of Alaska

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br><br>    Plaintiff,<br><br>      v.<br><br>DEB HAALAND, in her capacity as Secretary of the Department of the Interior; LAURA DANIEL-DAVIS, in her capacity as Principal Deputy Assistant Secretary, Land and Minerals Management, Bureau of Land Management; CHAD PADGETT, in his capacity as Alaska State Director, Bureau of Land Management; and BUREAU OF LAND MANAGEMENT,<br><br>    Defendants. | CIVIL ACTION NO:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

    1.     On this date 63 years ago, Congress enacted the Alaska Statehood Act,

promising the newly formed State and its citizens approximately 103 million acres of

federal lands.[1] Pub. L. 85-508, § 6, 72 Stat. 339 (1958) ("Statehood Act"). These lands were intended to provide the economic and natural resource base for the newly formed state to generate sufficient income and employment to become self-sufficient. *Id.* Today, on the anniversary of the Statehood Act, the State and its citizens still have not received the full benefit of the lands promised.

2.     Fifty years ago, Congress enacted the Alaska Native Claims Settlement Act ("ANCSA") in an effort to settle Alaska Natives' land claims and, in part, to clear obstacles preventing the State from receiving its Statehood lands. Pub. L. 92-203, 85 Stat. 688 (1971). ANCSA is a one-of-a-kind, three-party agreement between the United States, the State of Alaska, and Alaska Natives outlining fundamental land ownership in Alaska. Today, despite Congressional resolution of these competing land claims, the State and its citizens have not received the full benefit of the lands promised.

3.     Forty-one years ago, Congress enacted the Alaska National Interest Lands Conservation Act ("ANILCA"), Pub. L. 96-487, 94 Stat. 2371 (1980), in part, to find "the proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition." 16 U.S.C. § 3101(d). With ANILCA, Congress attempted, once and for all, to identify which lands would be entered into the conservation system, which lands would be open to multiple use, and, for all practical purposes, which lands would be open to conveyance

---

[1] Following other statutory conveyances and amendments, *inter alia*, the total Statehood land entitlement due the State exceeded 105 million acres.

to the State and Alaska Natives. Nonetheless, today, the State and its citizens have not received the full benefit of the lands promised.

4.     Seventeen years ago, Congress enacted the Alaska Land Transfer Acceleration Act ("ALTAA"), Pub. L. 108-452, 118 Stat. 3575 (2004), which "impose[d] very strict provisions on the [Bureau of Land Management ("BLM")] to complete land conveyances by 2009." 149 Cong. Rec. S10046, S10047 (July 25, 2003) (statement of Sen. Murkowski).  The 2009 goal has come and gone, and yet, today, the State and its citizens have not received the full benefit of the lands promised.

5.     One of the apparent obstacles to the State receiving its remaining Statehood entitlement lands is an obsolete provision of ANCSA.  ANCSA Section 17(d)(1) provided the Secretary of Interior with authority to withdraw federal public lands for study and to determine which lands should be included in the conservation system, which lands should be managed for use under the public land laws, and, effectively, which lands should be made available to the State and Alaska Natives for land selections. 43 U.S.C. § 1616(d)(1). ANCSA Section 17(d)(1) withdrawals were intended to be temporary, *Id.*, but, due to agency inaction, many of them remain in place to this day, needlessly encumbering federal lands and preventing the conveyance of selected lands to the State and Alaska Natives.

6.     Pursuant to ALTAA, in 2006, BLM reviewed many ANCSA Section 17(d)(1) withdrawals and identified those that could, and should, be revoked. Since then, revocations of these ANCSA Section 17(d)(1) withdrawals have been slow in

*State of Alaska v. Haaland, et. al*                              Civil Action No._____
Complaint for Declaratory and Injunctive Relief                              Page 3 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 3 of 58

coming, with only three being issued prior to January 2021: one in 2018 and two in

2019. Public Land Order ("PLO") No. 7874, 83 Fed. Reg. 50,117 (Oct. 4, 2018)

(Goodnews Bay area); PLO No. 7879, 84 Fed. Reg. 32,946 (July 10, 2019) (Fortymile

area); PLO No. 7880, 84 Fed. Reg. 32,945 (July 10, 2019) (Bering Glacier area).

7.    In January 2021, following the recommendations of BLM, then-Secretary

of Interior David Bernhardt executed a series of PLOs revoking, in whole or in part,

16 obsolete ANCSA Section 17(d)(1) withdrawals covering nearly 28 million acres of

federal public lands.  PLO Nos. 7899, 7900, 7901, 7902, and 7903 (attached hereto at

Exhibits A-E). The Biden administration, however, has refused to allow these revocations

to go into effect.

8.    In this action, Plaintiff State of Alaska, through the Office of the

Attorney General, challenges decisions by the BLM to unlawfully delay the effect of the

opening order associated with PLO No. 7899. Further, BLM's decisions unlawfully

delayed the publication of PLO Nos. 7900, 7901, 7902, and 7903, each of which was

properly executed by Secretary Bernhardt during his tenure. Plaintiff seeks an order from

this Court compelling BLM to promptly publish in the Federal Register all five lawfully

executed PLOs with effective dates no later than 30 days after publication.

## JURISDICTION AND VENUE

9.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action

because the matter in controversy arises under the laws of the United States, including

but not limited to (a) the Administrative Procedure Act, 5 U.S.C. § 706; (b) the

*State of Alaska v. Haaland, et. al*                                    Civil Action No._____
Complaint for Declaratory and Injunctive Relief                        Page 4 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 4 of 58

Declaratory Judgment Act, 28 U.S.C. § 2201; (c) Section 204 of the Federal Land Policy and Management Act, 43 U.S.C. § 1714; and (d) Section 1326 of the Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3213.

10.     Pursuant to 28 U.S.C. § 1391(e), venue lies in this judicial district because the federal lands at issue are located within the District of Alaska.

## PARTIES

11.     Plaintiff State of Alaska is a sovereign state, with a sovereign interest in the management and conservation of lands to which it has title.  In bringing this lawsuit, the State of Alaska seeks to compel agency action unreasonably delayed or unlawfully withheld, which has caused undue delay of the conveyance of lands to which the State is entitled under the Statehood Act and other authorities.

12.     Defendant Deb Haaland is the Secretary of the Interior.  In that capacity, she is responsible for the proper administration of the Bureau of Land Management. Defendant Haaland is sued in her official capacity.

13.     Defendant Laura Daniel-Davis is the Principal Deputy Assistant Secretary, Land and Minerals Management, Bureau of Land Management. Purportedly in that capacity, she executed the extensions of the opening order at issue in this case. Defendant Daniel-Davis is sued in her official capacity.

14.     Defendant Chad Padgett is the Alaska State Director, Bureau of Land Management. In that capacity, he is responsible for the proper administration of the

Alaska State Office of the Bureau of Land Management. Defendant Padgett is sued in his official capacity.

15.     Defendant Bureau of Land Management is an agency of the United States Department of Interior, and is the federal agency primarily responsible for the lawful management of federal public lands in Alaska, including the lands referenced in PLO Nos. 7899, 7900, 7901, 7902, and 7903.

## FACTUAL BACKGROUND

## I.     PROMISES OF ALASKA STATEHOOD.

16.     Alaskans' desire to control Alaska's lands and resources became a coalescing force that motivated many to support the statehood effort after World War II. *See, e.g.*, *Sturgeon v. Frost*, 587 U.S. ___, 139 S. Ct. 1066, 1073-1076 (2019); *Metlakatla Indian Cmty., Annette Islands Reserve v. Egan*, 369 U.S. 45, 47 (1962); *see generally* Terrance Cole, *Fighting for the Forty-Ninth Star: C. W. Snedden and the Crusade for Alaska Statehood* (U. of Alaska Press, 2010) ("The quest for statehood in the 1950s was fueled by growing dissatisfaction with federal management of the territory."). Opponents to statehood raised several compelling objections, including Alaska's small population, narrow tax base, and the questionable financial means to govern itself. *Trustees for Alaska v. State*, 736 P.2d 324, 335-36 (Alaska 1987).

17.     To overcome these objections, advocates of statehood argued that Congress should convey significant lands to the new state in the hope that the lands would generate

*State of Alaska v. Haaland, et. al*                                          Civil Action No._____
Complaint for Declaratory and Injunctive Relief                              Page 6 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 6 of 58

enough revenue so the state could govern itself. As the Alaska Supreme Court explained, this argument won the day.

> That Congress recognized the financial burden awaiting the new state is clear from its debates. It is equally clear that the large statehood land grant and the grant of the underlying mineral estate were seen as important means by which the new state could meet that burden. Congress, then, granted Alaska the mineral estate with the intention that the revenue generated therefrom would help fund the new state's government.

*Id*. at 337. Congress eventually agreed to admit Alaska into the Union on terms set out in the Alaska Statehood Act.

18.     The Statehood Act's passage, however, did not complete the statehood process; before Alaska could enter the Union, the Act required ratification by the "State and its people." Statehood Act, § 8(b).  Based on the promises provided by the Statehood Act, Alaskans ratified statehood on August 26, 1958. *State v. Lewis*, 559 P.2d 630, 639 (Alaska 1977).

19.     The United States Supreme Court has characterized the land grant provisions of statehood acts as a "'solemn agreement' which in some ways may be analogized to a contract between private parties," *Andrus v. Utah*, 446 U.S. 500, 507 (1980), and as "an unalterable condition of the admission, obligatory upon the United States." *Beecher v. Wetherby*, 95 U.S. 517, 523 (1877).

20.     In Alaska, the centerpiece of the compact between the State of Alaska and the United States is the State's right to select lands and manage these lands for the public's benefit. *See Trustees for Alaska*, 736 P.2d at 335 ("The primary purpose of the statehood land grants contained in section 6(a) and (b) of the Statehood Act was to ensure

the economic and social well-being of the new state."). The Statehood Act expressly provided the State with the right to select over 103-million acres of federal land, along with the underlying mineral resources.

21.     Congress allowed the State to select lands that would fund State government and provide economic benefits to State residents. *Udall v. Kalerak*, 396 F.2d 746, 749 (9th Cir. 1968); *United States v. Atlantic Richfield Co.*, 435 F. Supp. 1009, 1016 & 1021 n.47 (D. Alaska 1977). It also gave the State all right and title to the selected lands and provided that "mineral deposits in such lands shall be subject to lease by the State as the State legislature may direct." Statehood Act, § 6(i); *see also*, S. Rep. No. 1028, 83rd Cong. 2d Sess. 6 (1954) ("the State is given the right to select lands known or believed to be mineral in character").

22.     The conveyance of mineral rights was deemed so essential to the State's ability to provide for itself that, should the State convey any portion of selected lands, it was required to reserve all mineral rights or forfeit those rights back to the federal government. Statehood Act, § 6(i).  It was left to the new state to make the most of its selection options and to fully utilize these lands in order to satisfy the State's budgetary obligations and the needs of Alaskans.

23.     Following statehood, initial State land selections proceeded slowly. This was largely the result of conflicts between the newly formed State and Alaska Natives, who claimed aboriginal title covering approximately 80% of Alaska. In 1966 Secretary of Interior Stewart Udall imposed a land "freeze" that effectively stopped the

transfer of lands claimed by Alaska Natives until Congress could act upon their claims.

*See* Joseph Rudd, *Who Owns Alaska? Mineral Rights Acquisition Amid Rapidly*

*Changing Land Ownership*, 20 Rocky Mountain Mineral Law Institute § 5 (1975).

In 1969, this informal land freeze was converted into a formal land withdrawal, known as

the "super-freeze."  PLO No. 4582, 34 Fed. Reg. 1025 (Jan. 23, 1969); PLO No. 4962,

35 Fed. Reg. 18,874 (Dec. 8 1970) (extending PLO No. 4582).

24.     In response to the claims of Alaska Natives, in 1971, Congress enacted

ANCSA. In exchange for ceding all aboriginal title, ANCSA provided Alaska Natives

and Native Corporations the right to select approximately 44 million acres of federal

public lands to provide an economic and resource base for Alaska Natives. 43 U.S.C.

§ 1611.

## II.     ANCSA SECTION 17(d)(1) WITHDRAWALS.

25.     In addition to settling claims of aboriginal title in Alaska, ANCSA also

included provisions requiring the study of public lands to determine the best use of the

lands. One such provision was ANCSA Section 17(d)(1).  43 U.S.C. § 1616(d)(1).

Section 17(d)(1) temporarily withdrew all vacant, unreserved, and unappropriated public

lands in Alaska from all forms of appropriation to allow the Secretary of Interior time to

review the lands and determine whether any portion of those lands should be withdrawn

permanently to ensure that the public interest in the lands was adequately protected.  *Id*.

26.     Although initially intended to last for only 90-days, Section 17(d)(1)

authorized the Secretary to issue additional land withdrawals to extend the time available

*State of Alaska v. Haaland, et. al*                                             Civil Action No._____
Complaint for Declaratory and Injunctive Relief                                             Page 9 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 9 of 58

to evaluate the classification of these lands. *Id.* Under this authority, the Secretary issued

a series of public land orders ("PLOs") between 1972 and 1975 that withdrew *all*

unreserved public lands in Alaska for study and classification. James D. Linxwiler,

*The Alaska Native Claims Settlement Act: The First 20 Years*, 38 Rocky Mountain

Mineral Law Institute § 2.04(8)(b) (1992) ("Acting under this authority [ANCSA Section

17(d)(1)], the Secretary of the Interior initially withdrew (d)(1) lands to create buffer

lands around (d)(2) withdrawals, but eventually exercised his authority to include all

unreserved public lands in Alaska in his (d)(1) withdrawals."). These Section 17(d)(1)

withdrawals removed the lands from disposal or appropriation under the public land laws

(including mining and mineral leasing laws) (except for PLO No. 5180, which did allow

for location of metalliferous minerals).

27.     The intent of the Section 17(d)(1) withdrawals was to temporarily limit

appropriations of the land in order to complete inventories of resources and assessment of

values which would allow for the orderly development of land use and management

objectives for present and future public needs; however, one effect of this multitude of

land withdrawals is that encumbered lands remained unavailable for conveyance to the

State and Alaska Natives to fulfill federal statutory entitlements.

28.     By the late 1970s, Congress had begun to grow tired of the pace of

classification of lands for inclusion into the federal conservation system, including both

ANCSA Section 17(d)(1) lands and lands withdrawal under other authorities. In part in

*State of Alaska v. Haaland, et. al*                                      Civil Action No._____
Complaint for Declaratory and Injunctive Relief                          Page 10 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 10 of 58

response to the ongoing delays in land classification, in 1980, Congress enacted

ANILCA.

29.     ANILCA presented a great compromise between land use and conservation,

and was intended to settle, once and for all, the extent of the land conservation system in

Alaska. The Congressional purpose statement of ANILCA provides:

> This Act provides sufficient protection for the national interest in the scenic,
> natural, cultural and environmental values on the public lands in Alaska, and
> at the same time provides adequate opportunity for satisfaction of the
> economic and social needs of the State of Alaska and its people; accordingly,
> the designation and disposition of the public lands in Alaska pursuant to this
> Act are found to represent a proper balance between the reservation of
> national conservation system units and those public lands necessary and
> appropriate for more intensive use and disposition, and thus Congress
> believes that the need for future legislation designating new conservation
> system units, new national conservation areas, or new national recreation
> areas, has been obviated thereby.

ANILCA § 101, 16 U.S.C. § 3101.

30.     Subsequently, during the 1980's, some limited studies and environmental

assessments were done and about 10 million acres of the land withdrawn by the Section

17(d)(1) withdrawals were opened to entry pursuant to ANILCA Section 1008, 16 U.S.C.

§ 3148. BLM, *Sec. 207 Alaska Land Transfer Acceleration Act: A Review of D-1

Withdrawals*, 3 (June 2006) ("2006 Report to Congress").

31.     In 2004, in response to the continual delay in revoking the remaining

Section 17(d)(1) withdrawals and to allow the outstanding land selections made by the

State, Alaska Natives, and Native Corporations to be conveyed, Congress passed

ALTAA.

*State of Alaska v. Haaland, et. al*                                Civil Action No._____
Complaint for Declaratory and Injunctive Relief                              Page 11 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 11 of 58

32.     ALTAA was enacted to provide a strategic plan for the completion of the

land selection process required by the Statehood Act and ANCSA, and, according to the

bill's sponsors, "imposes very strict provisions on the agency to *complete land*

*conveyances by 2009* to Alaska Natives, the State of Alaska and the Native

Corporations." 149 Cong. Rec. S10046, S10047 (July 25, 2003) (statement of Sen.

Murkowski) (emphasis added).

33.     In order to accomplish its goal, ALTAA required the Department of Interior

to review the status of Section 17(d)(1) land withdrawals to determine if any portion of

the lands should be reopened to appropriation.

34.     In June 2006, BLM submitted a report to Congress detailing the status of

the Section 17(d)(1) withdrawals, and evaluated the effects should those withdrawals be

lifted; however, the 2006 Report stopped short of making official recommendations for

revocation of any of the Section 17(d)(1) withdrawals.

35.     ALTAA expressly required two reports. The 2006 Report to Congress was

prepared to satisfy ALTAA § 207, which required a status report of the Section 17(d)(1)

withdrawals no later than 18 months after the date of enactment.  Pub. L. No. 108-452,

§ 207, 118 Stat. 3575, 3585–3586 (2004).

36.     In addition, ALTAA § 601 required a second report, within three years of

enactment, that was to include an update of the status of land conveyances, and

recommendations for completing the conveyances by 2009. Pub. L. No. 108-452,

§ 601, 118 Stat. at 3594–3595. Although BLM expressly stated that it would supplement

*State of Alaska v. Haaland, et. al*                                    Civil Action No._____
Complaint for Declaratory and Injunctive Relief                        Page 12 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 12 of 58

the 2006 Report to Congress to satisfy the § 601 requirement, it does not appear that BLM ever completed the § 601 report to Congress and has not provided the required strategy for completing the conveyances.

37.    In its 2006 Report to Congress, BLM identified nearly 160 million acres of land that continued to be affected by Section 17(d)(1) withdrawals, including approximately 57 million acres of BLM lands.  According to BLM, "[m]any of these d-1 withdrawals have outlived their original purpose. . . . *Approximately 152,181,400 acres or 95% of these withdrawals could be lifted consistent with the protection of the public's interest*."  2006 Report to Congress, 5 (emphasis added).

38.    In contrast, BLM only found that approximately 6.7 million acres of 17(d)(1) withdrawals continued to be warranted.  *Id*. at 6.

39.    Importantly, BLM found that revocation of the Section 17(d)(1) withdrawals *would have no immediate impact for a majority of the lands involved*. "Because remaining segregations overlap the d-1 withdrawals, lifting these withdrawals would provide immediate entry on only 21,459,700 acres or 14% of the d-1s recommended to be lifted." *Id*.

40.    Moreover, BLM found that "the original protections from the d-1 withdrawals are no longer critical for the protection of the public's interest. *The d-1 withdrawals are an unnecessary encumbrance on the public land records complicating interpretation of the title records by the public*." *Id.* at 6 (emphasis added).

*State of Alaska v. Haaland, et. al*                                    Civil Action No._____
Complaint for Declaratory and Injunctive Relief                      Page 13 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 13 of 58

41. Indeed, with the completion of resource management plans or other land use planning documents for BLM-managed lands—itself a multi-year process—the resource inventories and value assessments required by ANCSA Section 17(d)(1) have been completed.

42. Today, 17 years after Congress enacted ALTAA to *accelerate* land transfers and deal with the obsolete Section 17(d)(1) withdrawals, millions of acres of public land in Alaska continue to be withdrawn from appropriation by obsolete 1970s-era public land orders.

## III. ALASKA NATIVE VIETNAM-ERA VETERANS' LAND SELECTIONS.

43. Because certain Alaska Natives who were eligible to apply for allotments were serving in the U.S. military when ANCSA was enacted, and to provide them an opportunity to apply for their allotments, Congress enacted the Alaska Native Veterans Allotment Act of 1998. 43 U.S.C. § 1629g. Unfortunately, few Alaska Native veterans were issued allotments under the 1998 law.

44. Most recently, with the Dingell Conservation, Management and Recreation Act of 2019, Congress provided Alaska Native Vietnam-era veterans another opportunity to apply for the allotments to which they are entitled, and an estimated 2,200 veterans or their heirs have again been given the right to select up to 160 acres of federal public lands in Alaska. Pub. L. 116-9, § 1119, 133 Stat. 580, 630–634 (2019) ("Dingell Act").

45. In a May 14, 2021 press release BLM stated that it would "expedite and process veterans' allotment applications." It was unclear from this press release whether

patents for applications, however, would be issued during the two-year review period at issue in this case.

46. In a May 17, 2021 press release, a Department of Interior spokesman confirmed that Alaska Native Vietnam-era veterans could apply for, and be granted, allotments before the two-year review at issue here is complete.

47. These press releases do not reference by what legal authority BLM could process some, but not all, statutory entitlements, *i.e.*, by what authority BLM could grant patents under the Dingell Act, but could refuse to act under the Statehood Act, ANCSA, or ALTAA.

48. Upon information or belief, no Alaska Native Vietnam-era veteran has received a patent to lands contained within an ANCSA Section 17(d)(1) withdrawal area at issue in this litigation.

## IV. SECRETARY BERNHARDT'S JANUARY 2021 ANCSA SECTION 17(d)(1) WITHDRAWAL REVOCATIONS.

49. At direct issue here are five public land orders that were executed in January 2021, and that are consistent with the findings of the 2006 Report.

50. Through its land management planning process, BLM proposed the revocation of 16 of the remaining unnecessary Section 17(d)(1) withdrawals, covering nearly 28 million acres. Those lands were recommended for revocation through duly executed records of decision. And, after decades of review, then-Secretary Bernhardt issued five new public land orders executed in January 2021, PLO Nos. 7899, 7900,

7901, 7902, and 7903, finally revoking some, but not all, of the unnecessary

Section 17(d)(1) withdrawals.

**A.    Public Land Order No. 7899 (Kobuk–Seward Peninsula).**

51.    After four and a half years of analysis, in September 2008, BLM issued the

Kobuk–Seward Peninsula Resource Management Plan ("RMP"), *available at*

https://eplanning.blm.gov/public_projects/lup/66967/82110/96711/Kobuk-

Seward_Peninsula_Record_of_Decision_and_Approved_Management_Plan.pdf.

52.    In the Kobuk–Seward Peninsula RMP, and in furtherance of Congress'

mandate in ALTAA that remaining Section 17(d)(1) withdrawals be reviewed and any

obsolete withdrawals be revoked, BLM recommended the revocation of all remaining

Section 17(d)(1) withdrawals from BLM-managed lands within the planning area, which

would make those lands available to appropriation under the public land laws.

Kobuk–Seward Peninsula RMP at Approved RMP-21.

53.    The Kobuk–Seward Peninsula RMP was issued following a detailed

environmental analysis, as required under the National Environmental Policy Act

("NEPA"), resulting in the issuance of a final environmental impact statement ("FEIS"),

*available at* https://eplanning.blm.gov/eplanning-ui/project/66967/570.

54.    In conjunction with the FEIS, BLM conducted a subsistence analysis.

Kobuk–Seward Peninsula FEIS at Appx. D.

55.    The 2008 Kobuk-Seward Peninsula RMP continues to be the operative land

use plan for the Kobuk-Seward Peninsula planning area.

*State of Alaska v. Haaland, et. al*                                      Civil Action No._____
Complaint for Declaratory and Injunctive Relief                              Page 16 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 16 of 58

56.     In early 2020, in accordance with the RMP, BLM recommended to the Secretary the revocation of Section 17(d)(1) withdrawals in four areas: Seward Peninsula NW containing 7,678,459.77 acres, Seward Peninsula SW containing 1,969,197.03 acres, Seward Peninsula NE containing 1,067,467.69 acres, and Umiat Meridian Area containing 957,188.67 acres, aggregating approximately 11,672,313.16 acres of ANCSA Section 17(d)(1) withdrawals. BLM, *Recommendation:  ANCSA 17(d)(1) Withdrawal Revocation in the Seward Peninsula Area*, *available at* https://eplanning.blm.gov/public _projects/1503985/200469598/20031145/250037344/DNA_RM_seward%20penn %20signed.pdf.

57.     Supporting the Recommendation, BLM reviewed the existing RMP and FEIS, and found that the proposed revocations were in conformance with the land use plan, and that the FEIS satisfied the requirements of NEPA.  BLM, *Determination of NEPA Adequacy (DNA) Worksheet*, *available at* https://eplanning.blm.gov/public _projects/1503985/200469598/20031146/250037345/DNA_seward%20penn%20NW %20AK%20signed.pdf.

58.     BLM found no new or changed circumstances that would require the preparation of any supplemental analyses.  *Id*.

59.     Following BLM's recommendation, on January 11, 2021, Secretary Bernhardt executed PLO No. 7899, formally revoking the ANCSA Section 17(d)(1) withdrawals from 9,727,730.01 acres of public lands. Specifically, PLO No. 7899 resulted in the partial revocation of PLO Nos. 5169, 5170, 5171, 5173, 5179, 5180,

5184, 5186, 5187, 5188, and 5353, as they affected public lands withdrawn under the authority of ANCSA Section 17(d)(1).

60.     The total acreage affected by PLO No. 7899 is 1,944,583.15 acres fewer than recommended for revocation by BLM.

61.     PLO No. 7899 was published in the Federal Register on January 19, 2021, 86 Fed. Reg. 5236 (Jan. 19, 2021).

62.     Under the terms of PLO No. 7899, on February 18, 2021, the affected lands were to be "open to all forms of appropriation under the general public land laws, including location and entry under the mining laws, leasing under the Mineral Leasing Act of February 25, 1920, as amended, *subject to valid existing rights, the provisions of existing withdrawals, other segregations of record, and the requirements of applicable law*." *Id.* at 5245 (emphasis added).

63.     The land withdrawals revoked by PLO No. 7899 include lands to which the State has made selections under the Statehood Act, as well as lands that would become open to selection by Alaska Native Vietnam-era veterans under the Dingell Act.

**B.     Public Land Order No. 7900 (Ring of Fire).**

64.     After five years of analysis, in March 2008, BLM issued the Ring of Fire RMP, *available at* https://eplanning.blm.gov/public_projects/lup/66969/128402 /156254/Ring_of_Fire_Record_of_Decision.pdf.

65.     In the Ring of Fire RMP, and in furtherance of Congress' mandate in ALTAA that remaining Section 17(d)(1) withdrawals be reviewed and any obsolete

withdrawals be revoked, BLM recommended the revocation of all remaining Section 17(d)(1) withdrawals from BLM-managed lands within planning area, which would make those lands available to appropriation under the public land laws. Ring of Fire RMP at Record of Decision - 7.

66.     The Ring of Fire RMP was issued following a detailed environmental analysis, as required under NEPA, resulting in the issuance of an FEIS, *available at* https://eplanning.blm.gov/eplanning-ui/project/66969/570.

67.     In conjunction with the FEIS, BLM conducted a subsistence analysis. Ring of Fire FEIS at Appx. I.

68.     The 2008 Ring of Fire RMP continues to be the operative land use plan for the Ring of Fire planning area.

69.     In early 2021, in accordance with the RMP, BLM recommended to the Secretary the revocation of the identified Section 17(d)(1) withdrawals. BLM, *Recommendation: ANCSA 17(d)(1) Withdrawal Revocation in the Ring of Fire Planning Area*, *available at* https://eplanning.blm.gov/public_projects/2011281/200472692 /20033386/250039585/0006-DNA_Recommendation_RoF_D1_Withdrawal_508 _AFO-GFO%20(1).pdf.

70.     Supporting the recommendation, BLM reviewed the existing RMP and FEIS, and found that the proposed revocations were in conformance with the land use plan, and that the FEIS satisfied the requirements of NEPA. BLM, *Determination of NEPA Adequacy (DNA) Worksheet*, *available at* https://eplanning.blm.gov/public

*State of Alaska v. Haaland, et. al*                                    Civil Action No._____
Complaint for Declaratory and Injunctive Relief                Page 19 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 19 of 58

_projects/2011281/200472692/20033387/250039586/0006-DNA_RoF_D1

_Withdrawal_DNA_508_AFO-GFO%20(1).pdf.

71.     BLM found no new or changed circumstances that would require the

preparation of any supplemental analyses. *Id*. Further, BLM found that no endangered or

threatened species use the lands for which the withdrawals would be revoked;

accordingly, no additional consultation with the U.S. Fish and Wildlife Service was

required under Section 7 of the Endangered Species Act ("ESA"). *Id.*

72.     Following BLM's recommendation, on January 16, 2021,

Secretary Bernhardt executed PLO No. 7900, formally revoking the ANCSA

Section 17(d)(1) withdrawals from 992,194.7 acres of public lands.

73.     Specifically, PLO No. 7900 resulted in the partial revocation of PLO Nos.

5174, 5175, 5176, 5179, 5180, 5184, 5186, 5188, and 5353, as they affected public lands

withdrawn under the authority of ANCSA Section 17(d)(1).

74.     PLO No. 7900 was not published in the Federal Register, however, and no

opening order has been issued.

75.     Under the terms of PLO No. 7900, 30 days after publication in the

Federal Register, the affected lands are to be "open to all forms of appropriation under

the general public land laws, including location and entry under the mining laws, leasing

under the Mineral Leasing Act of February 25, 1920, as amended, *subject to valid*

*existing rights, the provisions of existing withdrawals, other segregations of record, and*

*the requirements of applicable law*." PLO No. 7900, ¶ 3 (emphasis added).

76.     The land withdrawals revoked by PLO No. 7900 include lands to which the

State has made selections under the Statehood Act, as well as lands that would become

open to selection by Alaska Native Vietnam-era veterans under the Dingell Act.

**C.     Public Land Order No. 7901 (Bay).**

77.     After four years of analysis, in November 2008, BLM issued the Bay RMP,

*available at* https://eplanning.blm.gov/public_projects/lup/66958/83788/100409

/Approved_Resource_Management_Plan_and_Record_of_Decision.pdf.

78.     In the Bay RMP, and in furtherance of Congress' mandate in ALTAA that

remaining Section 17(d)(1) withdrawals be reviewed and any obsolete withdrawals be

revoked, BLM recommended the revocation of all of remaining Section 17(d)(1)

withdrawals from BLM-managed lands within the planning area, which would make

those lands available to appropriation under the public land laws. Bay RMP at Approved

RMP-19.

79.     The Bay RMP was issued following a detailed environmental analysis, as

required under NEPA, resulting in the issuance of a FEIS, *available at*

https://eplanning.blm.gov/eplanning-ui/project/66958/570.

80.     In conjunction with the FEIS, BLM conducted a subsistence analysis.

Bay FEIS at Appx. D.

81.     The 2008 Bay RMP continues to be the operative land use plan for the

Bay planning area.

*State of Alaska v. Haaland, et. al*                                          Civil Action No._____
Complaint for Declaratory and Injunctive Relief                                          Page 21 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 21 of 58

82.     In early 2021, in accordance with the RMP, BLM recommended to the Secretary the revocation of the identified Section 17(d)(1) withdrawals. BLM, *Recommendation:  ANCSA 17(d)(1) Withdrawal Revocation in the Bay Planning Area*, *available at* https://eplanning.blm.gov/public_projects/2002719/200472691/20033384 /250039583/0001-DNA_Recommendation_Dillingham_D1_Withdrawal _01082021_508.pdf.

83.     Supporting the recommendation, BLM reviewed the existing RMP and FEIS, and found that the proposed revocations were in conformance with the land use plan, and that the FEIS satisfied the requirements of NEPA.  *Id.*

84.     BLM found no new or changed circumstances that would require the preparation of any supplemental analyses.  BLM, *Documentation of NEPA Adequacy (DNA) Worksheet*, *available at* https://eplanning.blm.gov/public_projects/2002719 /200472691/20033385/250039584/0001-DNA_Dillingham_D1_Withdrawal _DNA_1122021_508_Final.pdf.

85.     Further, BLM found that no endangered or threatened species use the lands for which the withdrawals would be revoked; accordingly, no additional consultation with the U.S. Fish and Wildlife Service was required under Section 7 of the ESA.  *Id*.

86.     Following BLM's recommendation, on January 16, 2021, Secretary Bernhardt executed PLO No. 7901, formally revoking the ANCSA Section 17(d)(1) withdrawals from 1,267,401 acres of public lands.

*State of Alaska v. Haaland, et. al*                                      Civil Action No._____
Complaint for Declaratory and Injunctive Relief                              Page 22 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 22 of 58

87.     Specifically, PLO No. 7901 resulted in the partial revocation of PLO Nos. 5174, 5179, 5180, 5184, and 5186, as they affected public lands withdrawn under the authority of ANCSA Section 17(d)(1).

88.     PLO No. 7901 was not published in the Federal Register and no opening order has been issued.

89.     Under the terms of PLO No. 7901, 30 days after publication in the Federal Register, the affected lands are to be "open to all forms of appropriation under the general public land laws, including location and entry under the mining laws, leasing under the Mineral Leasing Act of February 25, 1920, as amended, *subject to valid existing rights, the provisions of existing withdrawals, other segregations of record, and the requirements of applicable law*." PLO No. 7901, ¶ 3 (emphasis added).

90.     The land withdrawals revoked by PLO No. 7901 include lands to which the State has made selections of under the Statehood Act, as well as lands that would become open to selection by Alaska Native Vietnam-era veterans under the Dingell Act.

**D.     Public Land Order No. 7902 (Bering Sea–Western Interior).**

91.     After eight years of analysis, in January 2021, BLM issued the Bering Sea–Western Interior RMP, *available at* https://eplanning.blm.gov/public_projects/36665 /200045911/20033500/250039699/BSWI_ROD_ARMP_BLM-(508).pdf.

92.     In the Bering Sea–Western Interior RMP, and in furtherance of Congress' mandate in ALTAA that remaining Section 17(d)(1) withdrawals be reviewed and any obsolete withdrawals be revoked, BLM recommended the revocation of all remaining

*State of Alaska v. Haaland, et. al*                                    Civil Action No._____
Complaint for Declaratory and Injunctive Relief                              Page 23 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 23 of 58

Section 17(d)(1) withdrawals from BLM-managed lands within the planning area, which would make those lands available to appropriation under the public land laws. Bering Sea–Western Interior RMP at II-57.

93.     The Bering Sea–Western Interior RMP was issued following a detailed environmental analysis, as required under NEPA, resulting in the issuance of a FEIS, *available at* https://eplanning.blm.gov/eplanning-ui/project/36665/570.

94.     In conjunction with the FEIS, BLM conducted a subsistence analysis. Bering Sea–Western Interior FEIS at Appx. D.

95.     The 2021 Bering Sea-Western Interior RMP continues to be the operative land use plan for the Bering Sea-Western Interior planning area.

96.     In early 2021, in accordance with the RMP, BLM recommended to the Secretary the revocation of the identified Section 17(d)(1) withdrawals. BLM, *Recommendation: ANCSA 17(d)(1) Withdrawal Revocation in the Bering Sea Western Interior*, *available at* https://eplanning.blm.gov/public_projects/2011477/200472696 /20033392/250039591/0007-DNA_Recommendation_BSWI_D1_Withdrawal _1.14.21_508.pdf.

97.     Supporting the recommendation, BLM reviewed the existing RMP and FEIS, and found that the proposed revocations were in conformance with the land use plan, and that the FEIS satisfied the requirements of NEPA. BLM, *Documentation of NEPA Adequacy (DNA) Worksheet*, *available at* https://eplanning.blm.gov/public

*State of Alaska v. Haaland, et. al*                                        Civil Action No._____
Complaint for Declaratory and Injunctive Relief                  Page 24 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 24 of 58

_projects/2011477/200472696/20033393/250039592/0007-DNA_BSWI_D1

_Withdrawal_DNA_508.pdf.

98.     BLM found no new or changed circumstances that would require the

preparation of any supplemental analyses. *Id.*

99.     Further, BLM found that no endangered or threatened species use the lands

for which the withdrawals would be revoked; accordingly, no additional consultation

with the U.S. Fish and Wildlife Service was required under Section 7 of the ESA. *Id.*

100.    Following BLM's recommendation, on January 15, 2021, Secretary

Bernhardt executed PLO No. 7902, formally revoking the ANCSA Section 17(d)(1)

withdrawals from 13,396,841 acres of public lands.

101.    Specifically, PLO No. 7902 resulted in the partial revocation of PLO Nos.

5172, 5173, 5179, 5180, 5184, and 5186, as they affected public lands withdrawn under

the authority of ANCSA Section 17(d)(1).

102.    PLO No. 7902 was not published in the Federal Register and no opening

order has been issued.

103.    Under the terms of PLO No. 7902, 30 days after publication in the

Federal Register, the affected lands are to be "open to all forms of appropriation under

the general public land laws, including location and entry under the mining laws, leasing

under the Mineral Leasing Act of February 25, 1920, as amended, *subject to valid*

*existing rights, the provisions of existing withdrawals, other segregations of record, and*

*the requirements of applicable law*." PLO No. 7902, ¶ 3 (emphasis added).

*State of Alaska v. Haaland, et. al*                                              Civil Action No._____
Complaint for Declaratory and Injunctive Relief                          Page 25 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 25 of 58

104.   The land withdrawals revoked by PLO No. 7902 include lands to which the State has made selections of under the Statehood Act, as well as lands that would become open to selection by Alaska Native Vietnam-era veterans under the Dingell Act.

**E.   Public Land Order No. 7903 (East Alaska).**

105.   After four and a half years of analysis, in September 2007, BLM issued the East Alaska RMP, *available at* https://eplanning.blm.gov/public_projects/lup/66965 /83535/100163/Record_of_Decision_and_Approved_Plan.pdf.

106.   In the East Alaska RMP, and in furtherance of Congress' mandate in ALTAA that remaining Section 17(d)(1) withdrawals be reviewed and any obsolete withdrawals be revoked, BLM recommended the revocation of 84% of the remaining Section 17(d)(1) withdrawals from BLM-managed lands within the planning area, which would make those lands available to appropriation under the public land laws. East Alaska RMP at 6.

107.   The East Alaska RMP was issued following a detailed environmental analysis, as required under NEPA, resulting in the issuance of a FEIS, *available at* https://eplanning.blm.gov/eplanning-ui/project/66965.

108.   In conjunction with the FEIS, BLM conducted a subsistence analysis. East Alaska FEIS at Appx. E.

109.   The 2007 East Alaska RMP continues to be the operative land use plan for the East Alaska planning area.

*State of Alaska v. Haaland, et. al*                                    Civil Action No._____
Complaint for Declaratory and Injunctive Relief                              Page 26 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 26 of 58

110. In early 2021, in accordance with the RMP, BLM recommended to the Secretary the revocation of the identified Section 17(d)(1) withdrawals. BLM, *Recommendation: ANCSA 17(d)(1) Withdrawal Revocation in the East Alaska RMP*, *available at* https://eplanning.blm.gov/public_projects/2011206/200470331/20033390/250039589/0009_DNA_RM_East%20Alaska%2017d(1)%20Withdrawal.pdf.

111. Supporting the recommendation, BLM reviewed the existing RMP and FEIS, and found that the proposed revocations were in conformance with the land use plan, and that the FEIS satisfied the requirements of NEPA. BLM, *Documentation of NEPA Adequacy (DNA) Worksheet*, *available at* https://eplanning.blm.gov/public_projects/2011206/200470331/20033391/250039590/0009_DNA_East%20Alaska%2017d(1)%20Withdrawal.pdf.

112. BLM found no new or changed circumstances that would require the preparation of any supplemental analyses. *Id*.

113. Further, BLM found that no endangered or threatened species use the lands for which the withdrawals would be revoked; accordingly, no additional consultation with the U.S. Fish and Wildlife Service was required under Section 7 of the ESA. *Id*.

114. Following BLM's recommendation, on January 16, 2021, Secretary Bernhardt executed PLO No. 7903, formally revoking the ANCSA Section 17(d)(1) withdrawals from 2,592,796 acres of public lands.

115.    Specifically, PLO No. 7903 resulted in the partial revocation of PLO Nos. 5174, 5176, 5178, 5179, 5180, 5184, and 5186, as they affected public lands withdrawn under the authority of ANCSA Section 17(d)(1).

116.    PLO No. 7903 was not published in the Federal Register and no opening order has been issued.

117.    Under the terms of PLO No. 7902, 30 days after publication in the Federal Register, the affected lands are to be "open to all forms of appropriation under the general public land laws, including location and entry under the mining laws, leasing under the Mineral Leasing Act of February 25, 1920, as amended, *subject to valid existing rights, the provisions of existing withdrawals, other segregations of record, and the requirements of applicable law*." PLO No. 7902, ¶ 3 (emphasis added).

118.    The land withdrawals revoked by PLO No. 7903 include lands to which the State has made selections of under the Statehood Act, as well as lands that would become open to selection by Alaska Native Vietnam-era veterans under the Dingell Act.

## V.    BLM'S UNLAWFUL DELAYS TO THE OPENING ORDER AND PUBLICATION OF THE ANCSA SECTION 17(d)(1) WITHDRAWAL REVOCATIONS.

119.    Rather than allowing the opening order contained within PLO No. 7899 to go into effect as published, on February 18, 2021, BLM issued its first extension to the opening order in PLO No. 7899.  86 Fed. Reg. at 10,131.

120.    In that extension, BLM postponed the effective date of the opening order provided by PLO No. 7899 for 60 days, until April 19, 2021.  *Id.*

*State of Alaska v. Haaland, et. al*                                      Civil Action No._____
Complaint for Declaratory and Injunctive Relief                          Page 28 of 58

121.   In the February 18, 2021 extension, BLM provided no explanation beyond stating the delay was necessary "[f]or orderly management of the public lands." *Id.*

122.   Again, rather than allowing the opening order contained within PLO No. 7899 to go into effect as amended, on April 16, 2021, BLM issued its second extension of the opening order in PLO No. 7899.  86 Fed. Reg. at 20,193.

123.   With the April 16, 2021 extension, however, BLM not only delayed the effective date of PLO No. 7899's opening order until April 16, 2023, but also indicated that it would not publish or make effective the other four ANSCA Section 17(d)(1) withdrawal revocations provided by PLO Nos. 7900, 7901, 7902, and 7903 for two years. 86 Fed. Reg. at 20,193 ("These Orders [PLO Nos. 7900, 7901, 7902, and 7903] will be included in the process described below for PLO 7899.").

124.   In the April 16, 2021 extension, BLM again stated the delay was "[f]or orderly management of the public lands." 86 Fed. Reg. at 20,193. BLM added one additional sentence to the later amended opening order that identified four purported defects in the procedure and underlaying environmental analyses:

> [i] Failure to secure consent from the Department of Defense with regard to lands withdrawn for defense purposes as required by Section 204(i) of the Federal Land Policy and Management Act (FLPMA) (43 U.S.C. 1714(i)); [ii] insufficient analysis under the National Environmental Policy Act, including failure to adequately analyze potential impacts on subsistence hunting and fishing, and reliance on outdated data in environmental impact statements prepared in 2006 and 2007; [iii] failure to comply with Section 106 of the National Historic Preservation Act; and [iv] possible failure to adequately evaluate impacts under Section 7 of the Endangered Species Act.

*Id.*

*State of Alaska v. Haaland, et. al*                                        Civil Action No._____
Complaint for Declaratory and Injunctive Relief                            Page 29 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 29 of 58

125.    BLM further provided: "During the two-year period after publication of this Federal Register Notice, the BLM will address comments, undertake additional analysis, complete necessary consultation, and correct defects in the PLOs. The BLM will publish a notice of intent to begin this process within 60 days of the publication of this notice." *Id.*[2]

126.    Both the February 18, 2021 and April 16, 2021 extensions to the opening order were executed by Laura Daniel-Davis, Principal Deputy Assistant Secretary, Land and Minerals Management.  *See* 86 Fed. Reg. at 10,131; 86 Fed. Reg. at 20,193.

127.    The position of Principal Deputy Assistant Secretary, Land and Minerals Management is not a Senate-confirmed position.[3] *See United States Policy and Supporting Positions (Plum Book)*, 119 (Dec. 2020), *available at* http://www.govinfo.gov.

128.    Instead of properly returning to operation of the public land laws the lands needlessly burdened by the 16 obsolete ANCSA Section 17(d)(1) withdrawals identified, which would make available nearly 28 million acres of BLM lands to satisfy longstanding land entitlements owed to the State of Alaska and Alaska Natives, with its February 18, 2021, and March 16, 2021 extensions, BLM has again returned its well-

---

[2] As of the date of this filing, BLM does not appear to have filed the "notice of intent to begin [its review] process."

[3] The State notes that Ms. Daniel-Davis has subsequently been nominated for the position of Assistant Secretary for Land and Minerals Management, a Senate-confirmed position. Nonetheless, Ms. Daniel-Davis did not hold a Senate-confirmed position on February 18, 2021 or April 16, 2021, when she executed the extensions to the opening order.

worn pattern of proposing revocation of these outdated and unnecessary land withdrawals, but then refusing to follow through on its proposals.

129.    Indeed, in response to the State's request for an update on the status of BLM's processing of State land selections in the Kobuk-Seward Peninsula area following the publication of PLO No. 7899, BLM affirmatively stated that it would not process State land selections covering lands contained within the subject PLOs during the two-year delay provided in the extensions of the opening order:

> In accordance with a notice published in the *Federal Register* on April 16, 2021 (*See* 86 FR 20193) the lands requested that are within PLO 7899 are currently not open to State selection; however, the BLM intends to complete an environmental analysis with related consultation regarding PLO 7899 during the next two years and we encourage the Department of Natural Resources to participate in that process to ensure your concerns are addressed.

> Once the lands within Tps. 4, 5 and 6 S., R. 33 W., Kateel River Meridian, are open for State selection, the State's filings will become an effective application without any further action on the State's part.

Letter from Chad B. Pagett, BLM State Director to Corri A. Feige, Commissioner, Alaska Department of Natural Resources, 2 (June 21, 2021) (attached hereto as Exhibit F).

130.    In this suit, the State of Alaska challenges BLM's unlawful and unprecedented delay and seeks an order compelling BLM to promptly publish all five January 2021 public land orders in the Federal Register, with opening orders to be made effective no more than 30 days after publication. These ANSCA Section 17(d)(1) withdrawals have outlived their intended purpose. After nearly 50 years, these undead public land withdrawals must be allowed to rest.

*State of Alaska v. Haaland, et. al*                                    Civil Action No._____
Complaint for Declaratory and Injunctive Relief                        Page 31 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 31 of 58

## FIRST CAUSE OF ACTION
### (Violation of Section 204, Federal Land Policy and Management Act)
#### (*Ultra vires* agency actions)

131.   The State realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

132.   Section 204 of the Federal Land Policy and Management Act ("FLPMA") grants to the Secretary the authority to "make, modify, extend, or revoke withdrawals." 43 U.S.C. § 1714(a).

133.   Section 204 also allows the Secretary to delegate this authority to "individuals in the Office of the Secretary who have been *appointed by the President, by and with the advice and consent of the Senate*." *Id*. (emphasis added).

134.   The extensions of the opening order at issue were both executed by Defendant Laura Daniel-Davis as Principal Deputy Assistant Secretary, Land and Minerals Management.  *See* 86 Fed. Reg. at 10,131; 86 Fed. Reg. at 20,193.

135.   Ms. Daniel-Davis's position was not a Senate-confirmed position. *See* United States Policy and Supporting Positions (Plum Book), 119 (Dec. 2020).

136.   Accordingly, she cannot be delegated authority to "make, modify, extend, or revoke withdrawals" pursuant to Section 204(a) of FLPMA.

137.   Nonetheless, the extensions of the opening order clearly "extend" the opening order associated with, and integrated within, PLO No. 7899.

138.   Because these extensions were executed by a non-confirmed agency official, they are unlawful and must be set aside. *See* 5 U.S.C. § 706(2)(A).

*State of Alaska v. Haaland, et. al*                                              Civil Action No._____
Complaint for Declaratory and Injunctive Relief                              Page 32 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 32 of 58

139.    Likewise, Ms. Daniel-Davis, a non-confirmed agency official, does not

have the authority to "extend" or "modify" the publication of validly executed

withdrawal revocations made by a Cabinet-level official, *i.e.*, Secretary Bernhardt.

140.    The extensions of the opening order's delay of publication of PLO Nos.

7901, 7902, 7903, and 7904 were also unlawful and must be set aside. *See* 5 U.S.C.

§ 706(2)(A).

## SECOND CAUSE OF ACTION
(Violation of Section 204, Federal Land Policy and Management Act)
(Unlawful withdrawal)

141.    The State realleges, as if fully set forth herein, each and every allegation

contained in the preceding paragraphs.

142.    Section 204 of FLPMA provides detailed procedures for the withdrawal of

public lands.  *See* 43 U.S.C. § 1714.

142.    Section 204 requires Congressional approval for any withdrawal greater

than 5,000 acres.  *Id.* § 1714(c).

144.    The withdrawals associated with PLO Nos. 7899, 7900, 7901, 7902, and

7903 individually each contain over 5,000 acres, and in the aggregate contain nearly

28 million acres.

145.    Accordingly, BLM's attempts to renew the withdrawals revoked by PLO

No. 7899, even temporarily by delaying the opening order, require a joint resolution of

both Houses of Congress.  *Id.*

*State of Alaska v. Haaland, et. al*                                    Civil Action No._____
Complaint for Declaratory and Injunctive Relief                          Page 33 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 33 of 58

146.     Likewise, BLM's attempts to renew the withdrawals revoked by PLO Nos. 7900, 7901, 7902, and 7903, even if unpublished, require a joint resolution of both Houses of Congress.  *Id.*

147.     Because the BLM failed to follow the procedures outlined in FLPMA, the delay resulting from the BLM's amended opening orders is unlawful and must be set aside. *See* 5 U.S.C. § 706(2)(A).

## THIRD CAUSE OF ACTION
(Violation of Section 1326, Alaska National Interest Lands Conservation Act)
(Unlawful withdrawal)

148.     The State realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

149.     Section 1326 of ANILCA requires Congressional approval for any withdrawal greater than 5,000 acres in Alaska.  16 U.S.C. § 3213.

150.     The withdrawals associated with PLO Nos. 7899, 7900, 7901, 7902, and 7903 individually each contain over 5,000 acres, and in the aggregate contain nearly 28 million acres.

151.     Accordingly, BLM's attempts to renew the withdrawals revoked by PLO No. 7899, even temporarily by delaying the opening order, require a joint resolution of both Houses of Congress.  *Id*.

152.     Likewise, BLM's attempts to renew the withdrawals revoked by PLO Nos. 7900, 7901, 7902, and 7903, even if unpublished, require a joint resolution of both Houses of Congress.  *Id.*

*State of Alaska v. Haaland, et. al*                                    Civil Action No._____
Complaint for Declaratory and Injunctive Relief                            Page 34 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 34 of 58

153.    Because the BLM failed to follow the procedures outlined in ANILCA, the

delay resulting from the BLM's amended opening orders is unlawful and must be set

aside.  *See* 5 U.S.C. § 706(2)(A).

## FOURTH CAUSE OF ACTION
(Violation of Section 706(1), Administrative Procedure Act)
(Ministerial action)

154.    The State realleges, as if fully set forth herein, each and every allegation

contained in the preceding paragraphs.

155.    Section 706(1) of the Administrative Procedure Act ("APA") provides

judicial authority to "compel agency action unlawfully withheld or unreasonably

delayed," 5 U.S.C. § 706(1), and extends to ministerial or nondiscretionary agency

actions compelled by statute or regulation.  *See Norton v. S. Utah Wilderness All*.,

542 U.S. 55, 64 (2004) ("*SUWA*"); *see also Vietnam Veterans of Am. v. Cent. Intel.*

*Agency*, 811 F.3d 1068, 1081 (9th Cir. 2016).

156.    "An agency 'ministerial act' for purposes of mandamus relief has been

defined as a clear, non-discretionary agency obligation to take a specific affirmative

action, which obligation is positively commanded and 'so plainly prescribed as to be free

from doubt.'" *Independence Min. Co. v. Babbitt*, 105 F.3d 502, 508 (9th Cir. 1997).

157.    The publication of a discretionary decision in the Federal Register

following the substantive determination is a ministerial act.

*State of Alaska v. Haaland, et. al*                                    Civil Action No._____
Complaint for Declaratory and Injunctive Relief                           Page 35 of 58

Case 3:21-cv-00158-HRH    Document 1    Filed 07/07/21    Page 35 of 58

158.     FLPMA Section 204(a) provides the Secretary with authority to revoke public land withdrawals and sets the time for which the revocation is effective. 43 U.S.C. § 1714(a).

159.     Once that discretion has been exercised, and in order to give the decision effect, BLM's regulations then provide that the Secretary's order must be published in the Federal Register. 43 C.F.R. § 2091.6.

160.     BLM possesses no decision-making discretion after the Secretary issues a substantive decision; BLM simply serves as the agency submitting the decision for publication.

161.     Accordingly, publication is merely a ministerial act.

162.     Secretary Bernhardt exercised his discretion and properly executed the Section 17(d)(1) withdrawal revocations.

163.     Further, by incorporating opening orders to be effective 30-days following publication, the Secretary also exercised his discretion in setting the date for opening.

164.     All that remains is for BLM to publish these orders in the Federal Register.

165.     BLM's continuing delay is unreasonable, and this Court must issue an order compelling BLM to fulfill its non-discretionary duty by submitting PLO Nos. 7900, 7901, 7902, and 7903 to the Federal Register for publication.  *See* 5 U.S.C. § 706(1).

*State of Alaska v. Haaland, et. al*                                        Civil Action No._____
Complaint for Declaratory and Injunctive Relief                             Page 36 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 36 of 58

# FIFTH CAUSE OF ACTION
## (Violation of Section 706(1), Administrative Procedure Act)
### (Unreasonable delay)

166.    The State realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

167.    The rights granted to the State of Alaska in the Statehood Act, and reflected in its constitution, cannot – and should not – be unilaterally diminished by any federal agency. *See Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 176 (2009) ("'[T]he consequences of admission are instantaneous, and it ignores the uniquely sovereign character of that event to suggest that subsequent events somehow can diminish what has already been bestowed' []. And that proposition applies *a fortiori* where virtually all of the State's public lands . . . are at stake.") (quoting, in part, *Idaho v. United States*, 533 U.S. 262, 284 (2001) (Rehnquist, C.J., dissenting)); *see also Alaska v. Ahtna, Inc.*, 891 F.2d 1401, 1404, 1406 (9th Cir. 1989). But that is exactly what BLM has done, and continues to do, by refusing to revoke obsolete land withdrawals that needlessly frustrate the land selection and conveyance process.

168.    Administrative agencies have a duty to decide issues presented to them within a reasonable time, 5 U.S.C. § 555(b), and reviewing courts have a duty to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

169.    As noted above, a two-year delay to complete a purely ministerial action is unreasonable. However, when put into context, the two-year delay is merely the continuation of a decades-long history of unreasonable delays.

*State of Alaska v. Haaland, et. al*                                    Civil Action No._____
Complaint for Declaratory and Injunctive Relief                        Page 37 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 37 of 58

170.	*Fifty years* since Congress enacted ANCSA Section 17(d)(1)and provided the Secretary with authority to *temporarily* withdraw lands for classification and study, millions of acres of ANCSA Section 17(d)(1) withdrawals remain.

171.	*Forty-one years* after Congress enacted ANILCA and determined which federal public lands should be incorporated into conservation system units, millions of acres of ANCSA Section 17(d)(1) withdrawals remain.

172.	*Seventeen years* since Congress enacted ALTAA and required BLM to evaluate and revoke obsolete ANCSA Section 17(d)(1) withdrawals by 2009, millions of acres of ANCSA Section 17(d)(1) withdrawals remain.

173.	Now, BLM purports to have the authority to delay the effect of lawfully executed orders by another *two* years for the nearly 28 million acres of ANCSA Section 17(d)(1) withdrawals.  BLM itself has consistently identified these very withdrawals as obsolete and appropriate for revocation since at least 2006.

174.	This pattern of delay is patently unreasonable, and this Court must issue an order compelling BLM to fulfill its non-discretionary duty by submitting PLO Nos. 7900, 7901, 7902, and 7903 to the Federal Register for publication and require that the incorporated opening orders be made effective no more than 30 days following publication. *See* 5 U.S.C. § 706(1).

*State of Alaska v. Haaland, et. al*                    Civil Action No._____
Complaint for Declaratory and Injunctive Relief                    Page 38 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 38 of 58

## SIXTH CAUSE OF ACTION
### (Violation of Section 706(2), Administrative Procedure Act)
### (Failure to explain changed position or policy)

175.    The State realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

176.    For nearly 20 years, BLM career officials have openly held the position that the ANCSA Section 17(d)(1) withdrawals are largely obsolete and should be revoked. While this process unfolded much more slowly than the State may have wished, for two decades the agency has been undertaking a series of successive steps to lift the Section 17(d)(1) withdrawals.  Until the actions now challenged by the State, the federal dominoes have consistently fallen in one direction.

177.    In 2006, pursuant to ALTAA, BLM issued its Report to Congress finding that most ANCSA Section 17(d)(1) withdrawals are no longer in the public interest and should be revoked.  2006 Report to Congress at 5–6.

178.    Beginning in 2007, following its resource management planning processes and environmental analyses, BLM issued RMPs that recommended the revocation of these 16 ANCSA Section 17(d)(1) withdrawals.  Kobuk–Seward Peninsula RMP at Approved RMP-21; Ring of Fire RMP at Record of Decision - 7; Bay RMP at Approved RMP-19; Bering Sea–Western Interior RMP at II-57; East Alaska RMP at 6.

179.    In 2018, following a NEPA adequacy review, BLM finally revoked the first set of ANCSA Section 17(d)(1) withdrawals with PLO No. 7874, which opened 229,715

*State of Alaska v. Haaland, et. al*                                      Civil Action No._____
Complaint for Declaratory and Injunctive Relief                          Page 39 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 39 of 58

acres of BLM-managed federal lands in the Goodnews Bay area. 83 Fed. Reg. 50,117 (Oct. 4, 2018).

180. The Goodnews Bay area revocations were recommended in the 2008 Bay RMP, and followed an identical process followed by BLM in PLO Nos. 7899, 7900, 7901, 7902, and 7903. BLM issued a Determination of NEPA Adequacy (DNA) Worksheet and a Decision Record on October 30, 2017 recommending that the Secretary revoke approximately 240,000 acres of Section 17(d)(1) withdrawals. BLM, *Determination of NEPA Adequacy (DNA) Worksheet* (Oct. 30, 2017), *available at* https://eplanning.blm.gov/public_projects/nepa/92821/124136/151345/0002_DNA _Goodnews_Bay_conformed.pdf; BLM, *Decision Record* (Oct. 30, 2017), *available at* https://eplanning.blm.gov/public_projects/nepa/92821/124136/151344/0002_DNA _Decision_Record_Conformed.pdf.

181. In the summer of 2019, again following NEPA adequacy reviews, BLM revoked the next sets of Section 17(d)(1) withdrawals with PLO Nos. 7879 and 7880, which opened another 1,151,877.36 acres in the Fortymile area and 217,486 acres in the Bering Glacier area, respectively. 84 Fed. Reg. 32,946 (July 10, 2019); 84 Fed. Reg. 32,945 (July 10, 2019).

182. The Fortymile area revocations were recommended in the 2016 Eastern Interior Fortymile RMP, following the same process. In May, 2018, BLM issued the Determination of NEPA Adequacy (DNA) Worksheet. BLM, *Determination of NEPA*

*State of Alaska v. Haaland, et. al*                                    Civil Action No._____
Complaint for Declaratory and Injunctive Relief                        Page 40 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 40 of 58

*Adequacy (DNA) Worksheet* (May 14, 2018), *available at* https://eplanning.blm.gov

/public_projects/nepa/103993/144870/178570/DNA-Final.pdf.

183.    The Bering Glacier area revocations were recommended in the 2007 East

Alaska RMP, following the same process. In January 2019, BLM issued the

Determination of NEPA Adequacy (DNA) worksheet and Recommendation.

BLM, *Determination of NEPA Adequacy (DNA) Worksheet* (Jan. 30, 2019), available at

https://eplanning.blm.gov/public_projects/nepa/121730/171416/208393/007_DNA

_17d1_Revocation.pdf; BLM, *Recommendation* (Jan. 30, 2019), *available at*

https://eplanning.blm.gov/public_projects/nepa/121730/171415/208392/007-DNA

_17d1_Withdrawl_Revociation_ReEcommendation.pdf.

184.    Beginning in early 2020, following additional NEPA adequacy reviews, the

BLM Alaska Office formally recommended to the Secretary the revocation of

16 ANCSA Section 17(d)(1) withdrawals in five resource planning areas.

BLM, *Recommendation, ANCSA 17(d)(1) Withdrawal Revocation in the Seward*

*Peninsula Area* (Mar. 5, 2020); BLM, *Recommendation, ANCSA 17(d)(1) Withdrawal*

*Revocation in the Ring of Fire Planning Area* (Jan. 13, 2021); BLM, *Recommendation,*

*ANCSA 17(d)(1) Withdrawal in the Bay Planning Area* (Jan 8, 2021);

BLM, *Recommendation, ANCSA 17(d)(1) Withdrawal Revocation in the Bering Sea*

*Western Interior Planning Area* (Jan. 16, 2021); BLM, *Recommendation,*

*ANCSA 17(d)(1) Withdrawal Revocation in the East Alaska RMP Planning Area*

(Jan.  11, 2021).

*State of Alaska v. Haaland, et. al*                                      Civil Action No._____
Complaint for Declaratory and Injunctive Relief                          Page 41 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 41 of 58

185.    In January 2021, Secretary Bernhardt issued the subject five PLOs adopting

BLM's recommended revocations.  PLO Nos. 7899, 7900, 7901, 7902, and 7903.

186.    Then, following an administration change, BLM suddenly reversed its

position, imposing the subject delays.  86 Fed. Reg. at 10131; 86 Fed. Reg. 20,193.

187.    When an agency changes its official position, it must provide a reasoned

explanation for doing so.  *E.g.*, *FCC v. Fox Television Studios, Inc.*, 556 U.S. 502,

515–516 (2009) ("a reasoned explanation is needed for disregarding facts and

circumstances that underlay or were engendered by the prior policy").

188.    Here, BLM provided no such reasoned explanation.

189.    In the February 18, 2021 extension of the opening order, BLM provided no

explanation beyond stating the delay was "[f]or orderly management of the public lands."

86 Fed. Reg. at 10,131.

190.    In the April 16, 2021 extension of the opening order, BLM again stated the

delay was "[f]or orderly management of the public lands."  86 Fed. Reg. at 20,193.

BLM added one additional sentence to the later extension that identified four purported

defects in the procedure and underlaying environmental analyses:

> [i] Failure to secure consent from the Department of Defense with regard to
> lands withdrawn for defense purposes as required by Section 204(i) of the
> Federal Land Policy and Management Act (FLPMA) (43 U.S.C. 1714(i));
> [ii] insufficient analysis under the National Environmental Policy Act,
> including failure to adequately analyze potential impacts on subsistence
> hunting and fishing, and reliance on outdated data in environmental impact
> statements prepared in 2006 and 2007; [iii] failure to comply with Section
> 106 of the National Historic Preservation Act; and [iv] possible failure to
> adequately evaluate impacts under Section 7 of the Endangered Species Act.

*State of Alaska v. Haaland, et. al*                                                    Civil Action No._____
Complaint for Declaratory and Injunctive Relief                              Page 42 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 42 of 58

*Id.*

191. A boiler-plate sentence regarding the "orderly management of the public lands" and another sentence asserting for the first time newly identified "defects" with no additional explanation are not a "reasoned explanation" for changing a position that the agency has held for nearly 20 years, and that has been asserted consistently in numerous published documents.

192. Accordingly, BLM's extensions of the opening order's delays in publication of these revocations and returning these lands to the operation of public land use laws are arbitrary and capricious, and must be set aside. *See* 5 U.S.C. § 706(2)(A).

## SEVENTH CAUSE OF ACTION
(Violation of Section 706(2), Administrative Procedure Act)
(Unnecessary Department of Defense consent)

193. The State realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

194. BLM's first listed justification for delaying the revocation of these obsolete Section 17(d)(1) withdrawals is its purported need to consult with the Department of Defense ("DoD") under Section 204(i) of FLPMA. 86 Fed. Reg. at 20,193.

195. Although Section 204(i) of FLPMA does require consent for revocations of withdrawals for lands under administration of a department or agency other that the Department of Interior, 43 U.S.C. § 1714(i), that provision is not implicated here.

196. Here, PLO Nos. 7899, 7900, 7901, 7902, and 7903 each expressly provide that the orders revoke only the ANSCA Section 17(d)(1) withdrawals, and leave unchanged any overlapping withdrawal made pursuant to any other provision of law.

197. Further, the opening orders executed by Secretary Bernhardt provide that the identified lands "*will continue to be subject to the terms and conditions of any other withdrawal, application, segregation of record, and other applicable law*." 86 Fed. Reg. at 5245 (PLO No. 7899, ¶ 3) (emphasis added); PLO No. 7900, ¶ 3; PLO No. 7901, ¶ 3; PLO No. 7902, ¶ 3; PLO No. 7903, ¶ 3.

198. Since BLM is not modifying or revoking any DoD withdrawal, the duty to consult is not triggered.

199. Upon information or belief, the lands described in PLO Nos. 7899, 7900, 7901, 7902, and 7903, as described in the following tables, contain only 1,069.10 acres of the nearly 28 million acres at issue (less than 0.004%) that appear to be covered by a military withdrawal or otherwise subject to DoD administration in addition to the revoked ANCSA Section 17(d)(1) withdrawal.

200. Upon information or belief, in the Kobuk-Seward Peninsula PLO revocation (PLO No. 7899), only three tracts of land totaling 795.19 acres of the 9,727,730.01 acres (0.008%) are encumbered by potential military reservations. *See* Table 1, below.

*State of Alaska v. Haaland, et. al*                    Civil Action No._____
Complaint for Declaratory and Injunctive Relief                    Page 44 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 44 of 58

Table 1 – List of Department of Defense withdrawals which are within the Kobuk-Seward Peninsula RMP and within PLO No. 7899.

| BLM Case No. | Site Name | Withdrawing Department | Legal Description | Initial Withdrawal Order | Acreage[4] |
|---|---|---|---|---|---|
| AKF 010087 | TIN CITY AFS | DEPT OF AIR FORCE | T2N R44W, Tract 37, K.R.M. T2N R45W, Tracts 37 and 38, K.R.M. | PLO 1672 23 Fed. Reg. 5088 (June 27, 1958) | 571.10 |
| AKF 022963 | NOATAK NG SITE | DEPT OF ARMY | T25N R19W, Lot 3 of US Survey No. 3778, K.R.M. | PLO 2020 24 Fed. Reg. 9474 (Nov. 17, 1959) | 0.50 |
| AKF 014487 | GRANITE MTN MILITARY RESERVE | DEPT OF AIR FORCE | T1S R13W, US Survey No. 13586, K.R.M. | PLO 1664 23 Fed. Reg. 4810 (June 23, 1958) | 223.59 |
| *TOTAL ACREAGE* | | | | | *795.19* |

201.   Upon information or belief, there are *no* military reservations on the 992,194.7 acres of land described in the Ring of Fire PLO revocation (PLO No. 7900).

202.   Upon information or belief, there are *no* military reservations on the 1,267,401 million acres of land described in the Bay PLO revocation (PLO No. 7901).

203.   Upon information or belief, in the Bering Sea-Western Interior PLO revocation (PLO No. 7902), only three tracts of land totaling 273.41 acres of the 13,396,841 million acres (0.002%) are potentially encumbered by military reservations or rights-of-way for military purposes.  *See* Table 2, below.

---

[4] Acreage calculations are based upon information contained within BLM's Alaska Case Retrieval Enterprise System ("ACRES"), *available at* https://sdms.ak.blm.gov/acres/acres_menu.

*State of Alaska v. Haaland, et. al*
Complaint for Declaratory and Injunctive Relief
Civil Action No._____
Page 45 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 45 of 58

Table 2 – List of Department of Defense withdrawals which are within the Bering Sea-Western Interior RMP and within PLO No. 7902.

| BLM Case No. | Site Name | Withdrawing Department | Legal Description | Establishing Order | Acreage |
|---|---|---|---|---|---|
| AKAA 094496 | COMMUNICATIONS SITE | DEPT OF AIR FORCE | T23N R34W portion of § 16, S.M. (unsurveyed) (see BLM case file for legal description) | Right-of-way application pending (filed Jan. 25, 2017)[5] | 1.00 |
| AKAA 094496 | COMMUNICATIONS SITE | DEPT OF AIR FORCE | T20N R43W portion of § 3, S.M. (see BLM case file for legal description) | Right-of-way application pending (filed Jan. 25, 2017)[6] | 1.00 |
| AKF 016448 | TATALINA AFS | DEPT OF AIR FORCE | T33N R36W portions of §§ 23 & 24, S.M. (see BLM case file for legal description) | PLO 815 17 Fed. Reg. 3236 (Apr. 8, 1952) | 271.41 |
| *TOTAL ACREAGE* | | | | | *273.41* |

204.    Upon information or belief, in the East Alaska PLO revocation (PLO No. 7903), only one 0.50-acre tract of the 2,592,796 acres (less than 0.00002%) is potentially encumbered by a right-of-way for military purposes. *See* Table 3, below.

Table 3 – List of Department of Defense withdrawals which are within the East Alaska RMP and within PLO No. 7903.

| BLM Case No. | Site Name | Withdrawing Department | Legal Description | Establishing Order | Acreage |
|---|---|---|---|---|---|
| AKAA 086240 | COMMUNICATIONS SITE | DEPT OF AIR FORCE | T19S R3E portion of § 18, F.M. (unsurveyed) (see BLM case file for legal description) | Right-of-way granted (June 13, 2007) | 0.50 |
| *TOTAL ACREAGE* | | | | | *0.50* |

205.    In summary, according to BLM's own records, less than seven relatively small tracts of land totaling less than 1,100 acres of the nearly 28-million acres at issue

---

[5] According to the BLM's ACRES database, it appears that this right-of-way application has not yet been granted.
[6] According to the BLM's ACRES database, it appears that this right-of-way application has not yet been granted.

*State of Alaska v. Haaland, et. al*                                      Civil Action No._____
Complaint for Declaratory and Injunctive Relief                              Page 46 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 46 of 58

appear to be under potential DoD administration, nearly all of which are on lands described in PLO Nos. 7899 and 7902. PLO No. 7903 appears to contain only 1/2-acre of potentially DoD administered land. Further, it appears that PLO Nos. 7900 and 7901 contain *no* DoD administered lands at all.

206. Based upon BLM's land records, BLM's stated rationale that it must consult with DoD before the revocation of these obsolete ANCSA Section 17(d)(1) withdrawals appears to be a post-hoc rationalization for what can only be considered a political decision of the incoming presidential administration. The continued delay of publication of PLO Nos. 7899, 7902, and 7903 is unjustified by the data. The delay of publication of PLO Nos. 7900 and 7901, which contain *no* DoD administered lands, is simply a bald attempt to veil a political decision under the cloak of inapplicable legal requirements.

207. Accordingly, BLM's extensions of the opening order's delays in publication of these revocations and returning these lands to the operation of public land use laws are arbitrary and capricious, and must be set aside. *See* 5 U.S.C. § 706(2)(A).

### EIGHTH CAUSE OF ACTION
(Violation of Section 706(2), Administrative Procedure Act)
(Arbitrary environmental analysis)

208. The State realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

209. BLM next asserts that there was "insufficient analysis under the National Environmental Policy Act, including failure to adequately analyze potential impacts on

*State of Alaska v. Haaland, et. al*                                      Civil Action No._____
Complaint for Declaratory and Injunctive Relief                          Page 47 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 47 of 58

subsistence hunting and fishing, and reliance on outdated data in environmental impact statements prepared in 2006 and 2007." 86 Fed. Reg. at 20,193.

210.    Apparently as a matter of administrative convenience, BLM deferred formally recommending that the ANCSA Section 17(d)(1) withdrawals be revoked through a separate process after the passage of ALTAA, preferring to address the withdrawals through the its on-going land use planning process. 2006 Report to Congress at 5 ("It may be appropriate to lift many of d-1 withdrawals and the most effective and preferred means in managing this process is through BLM's land use planning process.").

211.    No statute or other legal authority provides that the revocation of an ANCSA Section 17(d)(1) withdrawal must be conducted through the land use planning process.

212.    The revocation of an ANCSA Section 17(d)(1) withdrawal does not directly result in any on-the-ground activities or development.

213.    During the land use planning process, as noted above, BLM has prepared detailed environmental impact statements for the lands at issue here, all in accordance with the requirements of NEPA.

214.    None of those environmental impact statements have been held unlawful, and each continues as the operative management plan. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 73 (2004) ("The land use plan is the 'proposed action' contemplated by the regulation. There is no ongoing 'major federal action' that could

*State of Alaska v. Haaland, et. al*                                                     Civil Action No._____
Complaint for Declaratory and Injunctive Relief                                     Page 48 of 58

Case 3:21-cv-00158-HRH    Document 1    Filed 07/07/21    Page 48 of 58

require supplementation (though BLM *is* required to perform additional NEPA analysis if a plan is amended or revised . . . )").

215.    Moreover, BLM has recently evaluated each of the five RMPs at issue and determined that each fully evaluated the proposed ANCSA Section 17(d)(1) withdrawal revocations.  BLM, *Determination of NEPA Adequacy (DNA) Worksheet* (Mar. 5, 2020) (Kobuk–Seward Peninsula); BLM, *Determination of NEPA Adequacy (DNA) Worksheet* (Jan. 13, 2021) (Ring of Fire); BLM, *Documentation of NEPA Adequacy (DNA) Worksheet* (Jan. 8, 2021) (Bay); BLM, *Documentation of NEPA Adequacy (DNA) Worksheet* (Jan. 16, 2021) (Bering Sea–Western Interior); BLM, *Documentation of NEPA Adequacy (DNA) Worksheet* (Jan. 11, 2021) (East Alaska).

216.    In its adequacy reviews, BLM has also determined that no new information exists that would mandate supplemental NEPA analyses.  *Id.*; *see* 36 C.F.R. § 1502.9(d) (supplemental EIS appropriate when the agency makes substantial changes to the proposed action or there are new circumstances or information relevant to environmental concerns); *Marsh v. Ore. Natural Res. Council*, 490 U.S. 360, 373 (1989) (decision to supplement an EIS is guided by a "rule of reason").

217.    Further, during the land use planning process, where appropriate, BLM conducted subsistence reviews.

218.    As with its NEPA analyses, none of the subsistence reviews has been held unlawful.

*State of Alaska v. Haaland, et. al*                                      Civil Action No._____
Complaint for Declaratory and Injunctive Relief                          Page 49 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 49 of 58

219.    Indeed, BLM has recently evaluated each of the five subsistence reviews and determined that each fully evaluated the proposed ANCSA Section 17(d)(1) revocations, and the potential impacts to subsistence resulting therefrom. BLM, *Determination of NEPA Adequacy (DNA) Worksheet* (Mar. 5, 2020) (Kobuk–Seward Peninsula); BLM, *Determination of NEPA Adequacy (DNA) Worksheet* (Jan. 13, 2021) (Ring of Fire); BLM, *Documentation of NEPA Adequacy (DNA) Worksheet* (Jan. 8, 2021) (Bay); BLM, *Documentation of NEPA Adequacy (DNA) Worksheet* (Jan. 16, 2021) (Bering Sea–Western Interior); BLM, *Documentation of NEPA Adequacy (DNA) Worksheet* (Jan. 11, 2021) (East Alaska).

220.    In its adequacy reviews, BLM has also determined that no new information exists that would mandate supplemental subsistence analyses. *Id.*; *see* 36 C.F.R. § 1502.9(d); *Marsh*, 490 U.S. at 373.

221.    BLM itself has determined that the NEPA analyses and subsistence reviews were adequate, and identified no new information that would change that determination. BLM, *Determination of NEPA Adequacy (DNA) Worksheet* (Mar. 5, 2020) (Kobuk–Seward Peninsula); BLM, *Determination of NEPA Adequacy (DNA) Worksheet* (Jan. 13, 2021) (Ring of Fire); BLM, *Documentation of NEPA Adequacy (DNA) Worksheet* (Jan. 8, 2021) (Bay); BLM, *Documentation of NEPA Adequacy (DNA) Worksheet* (Jan. 16, 2021) (Bering Sea–Western Interior); BLM, *Documentation of NEPA Adequacy (DNA) Worksheet* (Jan. 11, 2021) (East Alaska).

*State of Alaska v. Haaland, et. al*                                Civil Action No._____
Complaint for Declaratory and Injunctive Relief                          Page 50 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 50 of 58

222.    Now, in a cursory sentence, BLM has identified potential "defects"

mandating further review. 86 Fed. Reg. at 20,193.  BLM's purported "defects" are little

more than a red herring designed to bolster a purely political decision.  As such, the

purported "defects" in the NEPA and subsistence analyses are arbitrary and capricious,

and must be set aside. *See* 5 U.S.C. § 706(2)(A).

**NINTH CAUSE OF ACTION**
(Violation of Section 706(2), Administrative Procedure Act)
(Unnecessary consultation)

223.    The State realleges, as if fully set forth herein, each and every allegation

contained in the preceding paragraphs.

224.    BLM next asserts that the amended opening orders are required to address

BLM's "failure to comply with Section 106 of the National Historic Preservation Act."

86 Fed. Reg. at 20,193.

225.    Congress enacted the National Historic Preservation Act ("NHPA") to

protect and preserve the historical and cultural foundations of the Nation. 54 U.S.C.

§ 300101.  The NHPA requires the agency to take the following actions prior to a federal

undertaking:  "make a reasonable and good faith effort to identify historic properties;

determine whether identified properties are eligible for listing on the National

Register . . . ; assess the effects of the undertaking on any eligible properties found;

determine whether the effect will be adverse; and avoid or mitigate any adverse effects."

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999)

(citations omitted).

226. To accomplish this requirement, federal agencies must consult with parties such as the State Historic Preservation Officer and potentially affected Indian tribes to determine whether historic or traditional cultural properties exist in the area of the planned activity. This process is called "Section 106 consultation." *See* 36 C.F.R. part 800 (regulations governing the Section 106 consultation process).

227. On May 13, 2021, BLM issued a press release indicating that it intended to initiate consultation with Alaska Native entities "on the decisions made in PLOs 7899, 7900, 7901, 7902, and 7903, including issues generally related to the withdrawals more broadly." BLM, *Interior Department Initiates Next Steps for Alaska Native Vietnam-Era Veterans Land Allotment Program Selections* (May 13, 2021), *available at* https://www.blm.gov/press-release/interior-department-initiates-next-steps-alaska-native-vietnam-era-veterans-land.

228. The press release continued, "We [BLM] must make sure that any decisions we make have the benefit of Tribal input, including impacts on Indian trust assets and potential impacts to cultural resources and federal subsistence users." *Id.* (quoting BLM Deputy Director for Policy and Programs Nada Culver).

229. It is important to note that Alaska Native Corporations and communities participated as cooperating agencies during the relevant land use planning processes, and thus had the opportunity to provide input regarding each of the operative RMP's recommendation to revoke the ANSCA Section 17(d)(1) withdrawals at issue.

*State of Alaska v. Haaland, et. al*                                      Civil Action No._____
Complaint for Declaratory and Injunctive Relief                          Page 52 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 52 of 58

230. Further, Alaska Native Corporations and communities have already made their land selections under ANCSA to provide for the "economic and social needs of Natives," and the time to amend those selections has long closed. 43 U.S.C. §§ 1601, 1611. Although these selections can be disclaimed, ANCSA provides no additional opportunity to modify or otherwise change those selections already made.

231. The press release further stated that "Native communities across Alaska rely on subsistence resources for their cultures and livelihoods. The attempted lands actions by the previous Administration were rushed and relied on outdated environmental analysis. As a result, they would have endangered rural subsistence preference for many Alaska Native individuals."

232. Again, Alaska Native Corporations and communities participated as cooperating agencies during the relevant land use planning processes, and thus had the opportunity to provide input during the subsistence evaluations conducted leading to the issuance of the operative RMPs.

233. Moreover, ANILCA Section 810 provides: "Nothing herein [requiring subsistence reviews during land use decisions] shall be construed to prohibit or impair the ability of the State or any Native Corporation to make land selections *and receive land conveyances pursuant to the Alaska Statehood Act or the Alaska Native Claims Settlement Act*." 16 U.S.C. § 3120(c) (emphasis added).

*State of Alaska v. Haaland, et. al*                                    Civil Action No._____
Complaint for Declaratory and Injunctive Relief                              Page 53 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 53 of 58

234. Accordingly, subsistence reviews, especially those that BLM has previously found valid, cannot be used to delay or prevent the conveyance of selected lands to the State or to Alaska Native Corporations.

235. BLM's continued delay in revoking the Section 17(d)(1) withdrawals "impairs the ability" of the State to receive its selected lands; and BLM's stated rationale, to evaluate potential subsistence effects, is patently prohibited by ANILCA Section 810.

236. Moreover, there is no federal undertaking proposed; that is, there is no specific project planned. Accordingly, there is specific project area in which to identify potential historic properties or analyze potential effects to those properties.

237. Instead, what is proposed is the removal of unnecessary land withdrawals from nearly 28 million acres. It would be illogical and impractical to require BLM to consult with affected Alaska Native entities to identify cultural or historic properties across such a vast landscape. *C.f. Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004) (environmental analyses must be "useful" and comply with a "rule of reason"). Any data collected would serve no useful purpose, as there is no project that could be modified or amended to mitigate speculative impacts.

238. The revocation of the obsolete Section 17(d)(1) land withdrawals is not a land use proposal. Thus, NHPA Section 106 consultation is not triggered and BLM's purported requirement for such consultation is arbitrary and capricious and must be set aside. *See* 5 U.S.C. § 706(2)(A).

*State of Alaska v. Haaland, et. al*                                    Civil Action No._____
Complaint for Declaratory and Injunctive Relief                    Page 54 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 54 of 58

(Violation of Section 706(2), Administrative Procedure Act)
(Arbitrary endangered species consultation)

239.    The State realleges, as if fully set forth herein, each and every allegation
contained in the preceding paragraphs.

240.    BLM offers one final justification for its amended opening orders,
"possible failure to adequately evaluate impacts under Section 7 of the Endangered
Species Act." 86 Fed. Reg. at 20,193.

241.    Section 7(a)(2) of the Endangered Species Act ("ESA") requires federal
agencies to ensure that "any action authorized, funded, or carried out by such agency is
not likely to jeopardize the continued existence of any endangered species or threatened
species or result in the destruction or adverse modification of [critical] habitat of such
species." 16 U.S.C. § 1536(a)(2).  To further this mandate, Section 7 requires
consultation between an action agency and the U.S. Fish and Wildlife Service or the
National Marine Fisheries Service, as appropriate.  *Id.*

242.    As noted above, during the land use planning process, BLM engaged in
detailed environmental analyses.  Where appropriate, those analyses included Section 7
consultations.

243.    During BLM's NEPA adequacy review, BLM evaluated those Section 7
consultations and found that no new information was available that would require the
reinitiation of consultation.  BLM, *Determination of NEPA Adequacy (DNA) Worksheet*
(Mar. 5, 2020) (Kobuk–Seward Peninsula); BLM, *Determination of NEPA Adequacy*

*State of Alaska v. Haaland, et. al*                                      Civil Action No._____
Complaint for Declaratory and Injunctive Relief                          Page 55 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 55 of 58

*(DNA) Worksheet* (Jan. 13, 2021) (Ring of Fire); BLM, *Documentation of NEPA*

*Adequacy (DNA) Worksheet* (Jan. 8, 2021) (Bay); BLM, *Documentation of NEPA*

*Adequacy (DNA) Worksheet* (Jan. 16, 2021) (Bering Sea–Western Interior); BLM,

*Documentation of NEPA Adequacy (DNA) Worksheet* (Jan. 11, 2021) (East Alaska).

244. Nonetheless, as it did with its purported NEPA and NHPA defects, BLM

now has identified potential "defects" mandating further ESA consultation, but it has

provided no details as to what those "defects" may be. 86 Fed. Reg. at 20,193.

245. And, as with its NEPA and NHPA justifications, BLM's purported

"defects" are yet another red herring designed to bolster a purely political decision. As

such, the purported "defects" are insufficient to justify the extensions of the opening

order. Accordingly, the purported "defects" in the NEPA and subsistence analyses are

arbitrary and capricious, and must be set aside. *See* 5 U.S.C. § 706(2)(A).

### **PRAYER FOR RELIEF**

**WHEREFORE** Plaintiff requests that this Court.

1. Issue a declaratory judgment that the extensions of the opening order issued

by Defendant Daniel-Davis were *ultra vires*, and therefore unlawful, as described in this

Complaint;

2. Issue a declaratory judgment that the BLM's ongoing delay in revoking the

obsolete ANCSA Section 17(d)(1) land withdrawals, as described in this Complaint,

constitutes agency action unlawfully withheld or unreasonable delayed under the APA;

*State of Alaska v. Haaland, et. al*                                    Civil Action No._____
Complaint for Declaratory and Injunctive Relief                        Page 56 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 56 of 58

3.      Issue a declaratory judgment that BLM's violations of FLPMA and ANILCA as described in this Complaint are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law";

4.      Issue a declaratory judgment that BLM's failure to explain its change in position or policy, as described in this Complaint, was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law";

5.      Issue a mandatory injunction setting aside the February 18, 2021 extension of the opening order and the April 16, 2021 extension of the opening order, and requiring BLM to publish in the Federal Register PLO Nos. 7899, 7900, 7901, 7902, and 7903, with effective dates no later than 30 days after publication;

6.      Retain continuing jurisdiction of this matter until the BLM fully remedies the violations of law complained of herein;

7.      Grant Plaintiff its costs, expenses, and attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

8.      Grant Plaintiff such further relief as this Court deems appropriate.

DATED this 7th day of July, 2021.

TREG R. TAYLOR
ATTORNEY GENERAL

By:     _/s/ Ronald W. Opsahl_____
        Ronald W. Opsahl (Alaska Bar No. NA20118)
        Senior Assistant Attorney General
        Department of Law
        1031 W. 4th Avenue, Suite 200
        Anchorage, AK 99501
        Telephone: (907) 269-5232
        Facsimile: (907) 279-2834
        Email:  ron.opsahl@alaska.gov

        Attorney for the State of Alaska

*State of Alaska v. Haaland, et. al*                Civil Action No._____
Complaint for Declaratory and Injunctive Relief                Page 58 of 58

Case 3:21-cv-00158-HRH   Document 1   Filed 07/07/21   Page 58 of 58