WO         IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


STATE OF ALASKA,                          )
                                          )
                          Plaintiff,      )
                                          )
        vs.                               )
                                          )
DEB HAALAND, in her capacity as Secretary )
of the Department of Interior, et al.,    )
                                          )     No. 3:21-cv-0158-HRH
                          Defendants.     )
_____ )


<u>O R D E R</u>

<u>Motion to Dismiss</u>

    Defendants move to dismiss plaintiff's complaint.[1]  This motion is opposed.[2]  Oral

argument was not requested and is not deemed necessary.

<u>Background</u>

    Plaintiff is the State of Alaska.  Defendants are Deb Haaland, in her capacity as

Secretary of the Department of the Interior; Laura Daniel-Davis, in her capacity as Principal

Deputy Assistant Secretary, Land and Minerals Management, Bureau of Land Management;

---

[1]Docket No. 12.

[2]Docket No. 17.

Case 3:21-cv-00158-HRH   Document 19   Filed 03/14/22   Page 1 of 24

Thomas Heinlein, in his capacity as Acting Alaska State Director, Bureau of Land Management; and the Bureau of Land Management.

The 1958 Alaska Statehood Act authorized the State to select substantial amounts of unreserved and unappropriated federal land within Alaska, including 103,350,000 acres of land from the public domain. Pub. L. No. 85-508, 72 Stat. 339, § 6(a) and (b). The Statehood Act provided that the State had 25 years in which to make its land selections.

In Section 4 of the Statehood Act, the State disclaimed any right or title to lands to which Alaska Natives asserted aboriginal rights, but the Act otherwise deferred addressing Alaska Native land claims. Id. at § 4. As the State selection process proceeded, Alaska Native communities began to raise concerns about conflicts involving land claims. As a result, in 1966, the Secretary of Interior imposed a "land freeze," suspending issuance of patents under the Statehood Act to protect Native land claims. And, on January 17, 1969, the Secretary signed Public Land Order (PLO) 4582, which withdrew all public lands in Alaska from entry under the public land laws and the mining and mineral leasing laws until Native land claims could be resolved. 34 Fed. Reg. 1025 (January 23, 1969).

On December 18, 1971, Congress passed the Alaska Native Claims Settlement Act (ANCSA), which, among other things, extinguished all aboriginal land claims and gave Alaska Native corporations established under ANCSA the right to select 44 million acres of public land in Alaska. 43 U.S.C. §§ 1601-1629h. Section 17(d)(1) of ANCSA revoked PLO 4582 and withdrew all unreserved public lands in Alaska from all forms of appropriation for

-2-

a period of 90 days.  43 U.S.C. § 1616(d)(1).  During the 90-day period, the Secretary was

to

> review the public lands in Alaska and determine whether any
> portion of these lands should be withdrawn under authority
> provided for in existing law to insure that the public interest in
> these lands is properly protected.  Any further withdrawal shall
> require an affirmative act by the Secretary under his existing
> authority, and the Secretary is authorized to classify or reclassify
> any lands so withdrawn and to open such lands to appropriation
> under the public land laws in accord with his classifications.

Id.  Pursuant to Section 17(d)(1) of ANCSA, the Secretary issued a series of PLOs from 1972

to 1973 that withdrew more than 158 million acres of land in Alaska from appropriation

under the public land laws.  These PLOs resulted in a portion of public lands in Alaska being

removed from availability for selection by the State.

In 1980, Congress passed the Alaska National Interest Lands Conservation Act.

(ANILCA).  Section 906 of ANILCA extended the State's selection period by an additional

ten years to January 3, 1994; required the State to prioritize its remaining selections; opened

some withdrawals to State selections; and allowed the State to "top file" on lands that were

currently unavailable for selection due to withdrawals.  A "top filing" is a "future selection"

that falls into place when the land becomes available for selection through the lifting of a

withdrawal or the rejection of a competing selection.  See 43 U.S.C. § 1635(e).

In 2004, Congress enacted the Alaska Land Transfer Acceleration Act (ALTAA) "[t]o

facilitate the transfer of land in the State of Alaska[.]"  Pub. L. No. 108-452, 118 Stat. 3575

(2004).  Section 207 of ALTAA gave the Secretary 18 months in which to

-3-

(1) review the withdrawals made pursuant to section 17(d)(1) of the Alaska Native Claims Settlement Act (43 U.S.C. 1616(d)(1)) to determine if any portion of the lands withdrawn pursuant to that provision can be opened to appropriation under the public land laws or if their withdrawal is still needed to protect the public interest in those lands;

(2) provide an opportunity for public notice and comment, including recommendations with regard to lands to be reviewed under paragraph (1); and

(3) submit to the Committee on Energy and Natural Resources of the Senate and the Committee on Resources of the House of Representatives a report that identifies any portion of the lands so withdrawn that can be opened to appropriation under the public land laws consistent with the protection of the public interest in these lands.

In June 2006, the BLM submitted the required report to Congress.  In the report, the BLM summarized that

there are more than 158,958,000 acres of d-1 withdrawals in Alaska.  Many of these d-1 withdrawals have outlived their original purpose. It may be appropriate to lift many of [the] d-1 withdrawals and the most effective and preferred means in managing this process is through BLM's land use planning process.[3]

The BLM can only recommend that the Secretary "make, modify, extend, or revoke withdrawals. . . ."  43 U.S.C. § 1714(a).  Thus, in the 2006 report, the BLM recommended that the Section 17(d)(1) withdrawals for approximately 152,181,400 acres "could be lifted

---

[3]Report to Congress:  Sec. 207 Alaska Land Transfer Acceleration Act:  A Review of D-1 Withdrawals at 5, available at https://www.blm.gov/sites/blm.gov.files/documents/files/BLM_AK_sec207report_d-1Withdrawals_low-res.pdf (last visited March 11, 2022).

-4-

consistent with the protection of the public's interest."[4]  In contrast, the BLM found that only

approximately 6.7 million acres of the Section 17(d)(1) withdrawals continued to be

warranted.  The BLM explained that "[l]ifting a d-1 withdrawal will primarily open the lands

to leaseable and locatable minerals" but that "in many instances lifting the withdrawal will

have no immediate effect."[5]  "Because remaining segregations overlap the d-1 withdrawals,

lifting these withdrawals would provide immediate entry on only 21,459,700 acres or 14%

of the d-1s recommended to be lifted."[6]  Nonetheless, the BLM recommended that many of

the Section 17(d)(1) withdrawals be lifted, in part because "[t]he d-1 withdrawals are an

unnecessary encumbrance on the public land records complicating interpretation of the title

records by the public."[7]

Following the 2006 report, the BLM issued a number of revisions to resource

management plans[8] for several planning areas in Alaska, which recommended revoking all,

_____

[4] Id.

[5] Id. at 4.

[6] Id. at 5.

[7] Id. at 6.

[8] A RMP is the name commonly given to a land use plan prepared by the BLM in accordance with section 202 of the Federal Land Policy and Management Act (FLPMA). "Generally, a land use plan describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps."  Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 59 (2004).  "Under NEPA, federal agencies must prepare an EIS before taking major Federal actions significantly affecting the quality of the environment." Western Watersheds Project v. Abbey, 719 F.3d 1035, 1045 (9th Cir. 2013) (citation
(continued...)

-5-

or a majority of, the Section 17(d)(1) withdrawals in the area. These revisions were issued for the following planning areas: 1) East Alaska (2007), 2) Bay (2008), 3) Ring of Fire (2008), 4) Kobuk-Seward Peninsula (2008), 5) Eastern Interior (2017), and 6) Bering Sea-Western Interior (BSWI) (2021).

In 2020 and early 2021, the BLM issued a number of Determinations of NEPA Adequacy (DNAs),[9] in which it concluded that the NEPA analysis conducted for the RMPs included adequate analysis to support withdrawal revocation decisions. The BLM also found that no additional consultation with the U.S. Fish and Wildlife Service was required under Section 7 of the ESA. Thus, the BLM recommended to then-Secretary Bernhardt that he revoke the majority of the Section 17(d)(1) withdrawals in the five planning areas.

_____

[8](...continued)
omitted). "By definition, preparation of an RMP is a major Federal action significantly affecting the quality of the human environment, and so categorically requires preparation of an EIS." Id. (citation omitted). The RMP and EIS are "published in a single document" whenever possible. 43 C.F.R. § 1601.0–6.

[9]"'DNAs are an administrative convenience created by the BLM, and are not defined in NEPA or its implementing regulations. . . .'" Friends of Animals v. Bureau of Land Mgmt., Case No. 2:16–cv–1670–SI, 2018 WL 1612836, at *9 (D. Or. Apr. 2, 2018) (quoting S. Utah Wilderness All. v. Norton, 457 F. Supp. 2d 1253, 1255 (D. Utah 2006)). "A DNA, according to BLM's NEPA Handbook, 'confirms that an action is adequately analyzed in existing NEPA document(s) and is in conformance with the [applicable] land use plan.'" Id. (quoting United States Department of Interior, Bureau of Land Management, National Environmental Policy Act Handbook, H–1790–1 ("NEPA Handbook") at § 5.1).

Based on the BLM's recommendation, in January 2021, Secretary Bernhardt signed PLOs 7899, 7900, 7901, 7902, and 7903.[10]  These five PLOs partially revoked Section 17(d)(1) withdrawals issued in 1972 and 1973 pursuant to Executive Order 10355 and Section 17(d)(1) of ANCSA.  The five PLOs revoked withdrawals on nearly 28 million acres of public lands in Alaska.

PLO 7899, which was for the Kobuk-Seward Peninsula planning area, was published in the Federal Register on January 19, 2021.[11]  PLO 7899 revoked Section 17(d)(1) withdrawals for "approximately 9,727,730.01 acres of public lands. . . ."[12]

"Lands included in a withdrawal that is revoked . . . do not automatically become open, but are opened through publication in the Federal Register of an opening order."  43 C.F.R. § 2091.6.  "An opening order may be incorporated in a Public Land Order that revokes or terminates a withdrawal. . . ."  Id.  PLO 7899 incorporated an opening order, which provided that on February 18, 2021, the lands at issue

> shall be open to all forms of appropriation under the general public land laws, including location and entry under the mining laws, leasing under the Mineral Leasing Act of February 25, 1920, as amended, subject to valid existing rights, the provisions

---

[10]Exhibits A-E, Complaint for Declaratory and Injunctive Relief, Docket No. 1.

[11]Exhibit A at 1, Complaint for Declaratory and Injunctive Relief, Docket No. 1.

[12]Id.

-7-

of existing withdrawals, other segregations of record, and the
requirements of applicable law.[13]

PLO 7900, for the Ring of Fire planning area, revoked Section 17(d)(1) withdrawals
for "approximately 992,194.7 acres of public lands. . . ."[14] PLO 7900 incorporated an
opening order that was to take effect "30 days after date of publication in the Federal
Register. . . ."[15] PLO 7900 has yet to be published in the Federal Register.

PLO 7901, for the Bay planning area, revoked Section 17(d)(1) withdrawals for
"approximately 1,267,401 acres of public lands. . . ."[16] PLO 7901 incorporated an opening
order that was to take effect "30 days after date of publication in the Federal Register. . . ."[17]
PLO 7901 has yet to be published in the Federal Register.

PLO 7902, for the BSWI planning area, revoked Section 17(d)(1) withdrawals for
"approximately 13,396,841 acres of public lands. . . ."[18] PLO 7902 incorporated an opening
order that was to take effect "30 days after date of publication in the Federal Register. . . ."[19]
PLO 7902 has yet to be published in the Federal Register.

---

[13]Id. at 10.

[14]Exhibit B at 1, Complaint for Declaratory and Injunctive Relief, Docket No. 1.

[15]Id. at 29.

[16]Exhibit C at 1, Complaint for Declaratory and Injunctive Relief, Docket No. 1.

[17]Id. at 21.

[18]Exhibit D at 1, Complaint for Declaratory and Injunctive Relief, Docket No. 1.

[19]Id. at 66.

-8-

PLO 7903, for the East Alaska planning area, revoked Section 17(d)(1) withdrawals for "approximately 2,592,796 acres of public lands. . . ."[20] PLO 7903 incorporated an opening order that was to take effect "30 days after date of publication in the Federal Register. . . ."[21] PLO 7903 has yet to be published in the Federal Register.

On February 18, 2021, the BLM extended the effective date of the opening order in PLO 7899 for 60 days, until April 19, 2021. The only explanation given for the extension was that it was for the "orderly management of the public lands. . . ." 86 Fed. Reg. 10131 (Feb. 18, 2021).

On April 16, 2021, the BLM extended the effective date of the opening order in PLO 7899 once again. 86 Fed. Reg. 20193. The effective date was extended until April 16, 2023. Id. The BLM also "clarifie[d] that [it] has not published opening orders for PLOs 7900, 7901, 7902, and 7903 and therefore they have no effective date." Id. The BLM further stated that PLOs 7900-7903 would "be included in the process described below for PLO 7899." Id. The BLM explained that it was taking this action because it had

> identified defects in the PLOs, including, but not limited to:
> Failure to secure consent from the Department of Defense with
> regard to lands withdrawn for defense purposes as required by
> Section 204(i) of the Federal Land Policy and Management Act
> . . . ; insufficient analysis under the National Environmental
> Policy Act, including failure to adequately analyze potential
> impacts on subsistence hunting and fishing, and reliance on
> outdated data in environmental impact statements prepared in

---

[20]Exhibit E at 1, Complaint for Declaratory and Injunctive Relief, Docket No. 1.

[21]Id. at 52.

> 2006 and 2007; failure to comply with Section 106 of the National Historic Preservation Act; and possible failure to adequately evaluate impacts under Section 7 of the Endangered Species Act. During the two-year period after publication of this Federal Register Notice, the BLM will address comments, undertake additional analysis, complete necessary consultation, and correct defects in the PLOs. The BLM will publish a notice of intent to begin this process within 60 days of the publication of this notice.[22]

Id. The April 16th decision was published in the Federal Register and was signed by defendant Daniel-Davis.

On July 7, 2021, the State commenced this action to challenge the April 16th decision. The State asserts ten causes of action in its complaint.

The First Cause of Action is a Section 706(2)(A) APA claim, in which the State alleges that the BLM violated Section 204(a) of FLPMA because the PLOs were signed by Daniel-Davis, who as a "non-confirmed agency official, does not have the authority to 'extend' or 'modify' the publication of validly executed withdrawal revocations made by a Cabinet-level official[.]"[23] The State alleges that because the April 16th decision was ultra vires agency action, it is "unlawful and must be set aside."[24]

The Second Cause of Action is a Section 706(2)(A) APA claim, in which the State alleges that the April 16th decision was an attempt "to renew the withdrawals revoked" by

---

[22]This Notice of Intent was published in the Federal Register on July 23, 2021. 86 Fed. Reg. 39053.

[23]Complaint for Declaratory and Injunctive Relief at 33, ¶ 139, Docket No. 1.

[24]Id. at 32-33, ¶¶ 138, 140.

-10-

the PLOs, that the withdrawals associated with the PLOs were all more than 5,000 acres each, and that Section 204 of FLPMA "requires Congressional approval for any withdrawal greater than 5,000 acres."[25] The State alleges that "[b]ecause the BLM failed to follow the procedures outlined in FLPMA," the April 16th decision is "unlawful and must be set aside."[26]

The Third Cause of Action is a Section 706(2)(A) APA claim, in which the State alleges that the April 16th decision was an attempt "to renew the withdrawals revoked" by the PLOs, that the withdrawals associated with the PLOs were all more than 5,000 acres each, and that "Section 1326 of ANILCA requires Congressional approval for any withdrawal greater than 5,000 acres in Alaska."[27] The State alleges that "[b]ecause the BLM failed to follow the procedures outlined in ANILCA," the April 16th decision is "unlawful and must be set aside."[28]

The Fourth Cause of Action is an APA unlawfully withheld claim. The State alleges that Secretary Bernhardt made substantive decisions in the PLOs and all that remains is the "ministerial act" of publication in the Federal Register.[29] The State alleges that the BLM is

---

[25]Id. at 33-34, ¶¶ 142, 145-146.

[26]Id. at 34, ¶ 147.

[27]Id. at 34, ¶¶ 150-152.

[28]Id. at 35, ¶ 153.

[29]Id. at 35-36, ¶¶ 157, 159, 161-164.

unlawfully withholding agency action by not publishing PLOs 7900-7903 in the Federal Register and that it should be compelled "to fulfill its non-discretionary duty" to publish the PLOs.[30]

The Fifth Cause of Action is an APA unreasonable delay claim. The State alleges that "a two-year delay to complete a purely ministerial action is unreasonable."[31] The State alleges that the BLM should be compelled "to fulfill its non-discretionary duty by submitting PLO Nos. 7900, 7901, 7902, and 7903 to the Federal Register for publication and require that the incorporated opening orders be made effective no more than 30 days following publication."[32]

The Sixth Cause of Action is an APA claim based on allegations that the April 16th decision was arbitrary and capricious because the BLM failed to explain why it "suddenly reversed its position" as to the land withdrawals which are the subject of the five PLOs.[33] The State alleges that "[a] boiler-plate sentence regarding the 'orderly management of the public lands' and another sentence asserting for the first time newly identified 'defects' with

---

[30] Id. at 36, ¶ 165.

[31] Id. at 37, ¶ 169.

[32] Id. at 38, ¶ 174.

[33] Id. at 42, ¶ 186.

no additional explanation are not a 'reasoned explanation' for changing a position that the agency has held for nearly 20 years[.]"[34]

The Seventh Cause of Action is an APA claim based on allegations that the April 16th decision was arbitrary and capricious because there was no need for the BLM "to consult with the Department of Defense ('DoD') under Section 204(i) of FLPMA."[35] The State alleges that there was no need for DoD consultation because the "BLM is not modifying or revoking any DoD withdrawal" and because the amount of land that might be subject to consultation totals "less than 1,100 acres of the nearly 28-million acres at issue. . . ."[36]

The Eighth Cause of Action is an APA claim based on allegations that the April 16th decision was arbitrary and capricious because there were no "'defects' in the NEPA and subsistence analyses. . . ."[37] The State alleges that the BLM complied with NEPA during the initial land use planning process and recently reevaluated whether supplemental NEPA analyses were mandated and that "during the land use planning process, where appropriate,

---

[34]Id. at 43, ¶ 191.

[35]Id. at 43, ¶ 194.

[36]Id. at 44, ¶ 198; 46, ¶ 205.

[37]Id. at 51, ¶ 222.

-13-

[the] BLM conducted subsistence reviews."[38]  The State alleges that the "BLM's purported 'defects' are little more than a red herring designed to bolster a purely political decision."[39]

The Ninth Cause of Action is an APA claim based on allegations that the April 16th decision was arbitrary and capricious because there was no need for National Historic Preservation Act "Section 106 consultation. . . ."[40]  The State alleges that Section 106 was not triggered because "[t]he revocation of the obsolete Section 17(d)(1) land withdrawals is not a land use proposal."[41]

The Tenth Cause of Action is an APA claim based on allegations that the April 16th decision was arbitrary and capricious because there were no "'defects' mandating further ESA consultation[.]"[42]  The State alleges that ESA consultations were done during the land use planning process and evaluated during the BLM's adequacy review.[43]  The State alleges that the "BLM's purported 'defects' are yet another a red herring designed to bolster a purely political decision."[44]

---

[38]Id. at 48-49, ¶¶ 213, 215, 217.

[39]Id. at 51, ¶ 222.

[40]Id. at 54, ¶ 238.

[41]Id.

[42]Id. at 56, ¶ 244.

[43]Id. at 55-56, ¶¶ 242-243.

[44]Id. at 56, ¶ 245.

-14-

Pursuant to Rules 12(b)(1) and (b)(6), Federal Rules of Civil Procedure, defendants now move to dismiss all of the State's claims.

## Discussion

Pursuant to Rule 12(b)(1), defendants first move to dismiss the State's First through Third and Sixth through Tenth Causes of Action because the April 16th decision does not constitute final agency action.[45] "A Rule 12(b)(1) jurisdictional attack may be facial or factual." <u>Safe Air for Everyone v. Meyer</u>, 373 F.3d 1035, 1039 (9th Circ. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." <u>Id.</u> "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." <u>Id.</u> "The court need not presume the truthfulness of the plaintiff's allegations." <u>Id.</u> "'Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden

---

[45]Defendants do not move to dismiss the State's Fourth and Fifth Causes of Action on final agency action grounds because "review of an agency's failure to act under Section 706(1) is an 'exception to the final agency action requirement.'" <u>Center for Environmental Health v. Wheeler</u>, 429 F. Supp. 3d 702, 715 (N.D. Cal. 2019) (quoting <u>ONRC Action v. Bureau of Land Mgmt.</u>, 150 F.3d 1132, 1137 (9th Cir. 1998)).

of establishing subject matter jurisdiction.'" Id. (quoting Savage v. Glendale Union High Sch., 343 F.3d 1036, 1039 n.2 (9th Cir. 2003)).

"The APA authorizes district courts to review only 'final agency action.'" S. Calif. Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency, 8 F.4th 831, 836 (9th Cir. 2021) (quoting 5 U.S.C. § 704). In the Ninth Circuit, "the final agency action requirement has been treated as jurisdictional." San Francisco Herring Assoc. v. Dep't of the Interior, 946 F.3d 564, 571 (9th Cir. 2019). Thus, if the April 16th decision was not final agency action, then the court would lack jurisdiction of the State's First through Third and Sixth through Tenth Causes of Action.

"For agency action to be final, it must 'mark the consummation of the agency's decisionmaking process' and 'must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" Gill v. United States Dep't of Justice, 913 F.3d 1179, 1184 (9th Cir. 2019) (quoting Bennett v. Spear, 520 U.S. 154, 177–78 (1997)). The court "'focus[es] on the practical and legal effects of the agency action' and interpret[s] finality in a 'pragmatic and flexible manner.'" Id. (quoting Or. Nat. Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 982 (9th Cir. 2006)).

The State argues that the April 16th decision is final agency action because it is "challenging the decision to initiate the review to begin with[.]"[46] The State argues that the BLM's decision to delay the effective date of the opening order in PLO 7899 and to delay

---

[46]Response in Opposition to Defendants' Motion to Dismiss at 30, Docket No. 17.

publishing PLOs 7900-7903 marks the consummation of the decisionmaking process pertaining to the two-year review. The State argues that legal consequences will flow from the April 16th decision because "for at least the two-year review period," the 28 million acres of land at issue will "not be available for conveyance to Alaska Native Vietnam-Era veterans or for the State's top-filings to convert to State selections, and these lands [will not be] open to mineral or other resource exploration."[47]

The State's argument fails because the April 16th decision does not mark the consummation of the BLM's decisionmaking process as to the revocation of the withdrawals in question. The issue at the heart of the State's challenge, despite its attempt to cast it differently, is revocation of the Section 17(d)(1) withdrawals. The April 16th decision does not mark the consummation of the BLM's decisionmaking process as to that issue. Rather, the April 16th decision is an intermediate step along the way to a final revocation decision. The decisionmaking process as it pertains to the revocation of the Section 17(d)(1) withdrawals in the five planning areas is still ongoing. No rights and obligations were determined in the April 16th decision as it was simply a decision to continue the revocation decisionmaking process. Likewise, no legal consequences flowed from the April 16th decision as it did not determine whether any of the Section 17(d)(1) withdrawals should be revoked.

---

[47]Id. at 31.

-17-

In sum, the April 16th decision does not constitute final agency action for purposes of the APA. Thus, the court lacks jurisdiction of the State's First through Third and Sixth through Tenth Causes of Action.[48] These Causes of Action are dismissed for lack of jurisdiction.

Pursuant to Rule 12(b)(6), defendants next move to dismiss the State's Fourth and Fifth Causes of Action.[49] "'To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Zixiang Li v. Kerry, 710 F.3d 995, 999 (9th Cir. 2013) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Iqbal, 556 U.S. at 678). "The plausibility standard requires more than the sheer possibility or conceivability that a defendant has acted unlawfully." Id. "'Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Iqbal, 556 U.S. at 678). "[T]he complaint must provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" In re Rigel Pharmaceuticals, Inc. Securities Litig., 697 F.3d 869, 875

---

[48]Because the April 16th decision was not final agency action, the court need not consider defendants' alternative Rule 12(b)(1) ripeness argument.

[49]Because the State's First, Second, Third and Seventh Causes of Action are being dismissed on final agency action grounds, the court need not consider defendants' alternative argument that these claims should be dismissed because they are implausible.

(9th Cir. 2012) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). "In evaluating a Rule 12(b)(6) motion, the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the light most favorable to the plaintiff." <u>Adams v. U.S. Forest Srvc.</u>, 671 F.3d 1138, 1142-43 (9th Cir. 2012). "However, the trial court does not have to accept as true conclusory allegations in a complaint or legal claims asserted in the form of factual allegations." <u>In re Tracht Gut, LLC</u>, 836 F.3d 1146, 1150 (9th Cir. 2016).

The State's Fourth Cause of Action is an unlawfully withheld APA claim.  The State alleges that "Secretary Bernhardt exercised his discretion and properly executed the Section 17(d)(1) withdrawal revocations" and that "[o]nce that discretion has been exercised, . . . BLM's regulations[,]" specifically 43 C.F.R. § 2091.6, "provide that the Secretary's order must be published in the Federal Register."[50]  The State alleges that the "BLM possesses no decision-making discretion after the Secretary issues a substantive decision; BLM simply serves as the agency submitting the decision for publication."[51]  The State seeks to have the court "issue an order compelling BLM to fulfill its non-discretionary duty by submitting PLO Nos. 7900, 7901, 7902, and 7903 to the Federal Register for publication."[52]

---

[50]Complaint for Declaratory and Injunctive Relief at 36, ¶¶ 159, 162, Docket No. 1.

[51]<u>Id.</u> at 36, ¶ 160.

[52]<u>Id.</u> at 36, ¶ 165.

-19-

Section 706(1) of the APA "empowers a reviewing court to 'compel agency action unlawfully withheld or unreasonably delayed.'" Firebaugh Canal Water Dist. v. United States, 712 F.3d 1296, 1301 (9th Cir. 2013 (quoting 5 U.S.C. § 706(1)). "'[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." Id. (quoting Norton, 542 U.S. at 64). The court has "no authority to compel agency action merely because the agency is not doing something [the court] may think it should do." Zixiang Li, 710 F.3d at 1004. Rather, the court's authority to compel agency action is limited to ministerial or non-discretionary actions required by statute or regulation. Id.

Whether the State's Fourth Cause of Action is plausible turns on whether 43 C.F.R. § 2091.6 requires the BLM to publish a PLO once the Secretary signs it. "The rules of statutory construction apply when interpreting an agency regulation." Roberto v. Dep't of Navy, 440 F.3d 1341, 1350 (Fed. Cir. 2006). The court begins by "determin[ing] whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." United States v. Boyd, 991 F.3d 1077, 1080 (9th Cir. 2021) (citation omitted). "If so, the inquiry must cease, provided the statutory scheme is coherent and consistent." Id. (citation omitted).

Section 2091.6 provides:

> The term of a withdrawal ends upon expiration under its own terms, or upon revocation or termination by the Secretary by publication in the Federal Register of a Public Land Order. Lands included in a withdrawal that is revoked, terminates or

-20-

expires do not automatically become open, but are opened through publication in the Federal Register of an opening order. An opening order may be incorporated in a Public Land Order that revokes or terminates a withdrawal or may be published in the Federal Register as a separate document. In each case, the opening order specifies the time, date and specific conditions under which the lands are opened.

The State argues that Section 2091.6 plainly provides that a revocation order must be published in the Federal Register once the Secretary signs it. But, nothing in the regulation indicates that Congress intended to impose on the BLM an obligation to publish a PLO once it is signed. The plain language of Section 2091.6 cannot be read as requiring the BLM to publish a PLO once the Secretary has signed it, particularly when the language of Section 2091.6 is compared to that of 43 C.F.R. § 2310.3-3(b)(1). Section 2310.3-3(b)(1) provides that "[w]hen an application has been finally allowed, in whole or in part, by the Secretary, an order to that effect <u>shall</u> be published promptly in the Federal Register." 43 C.F.R. § 2310.3-3(b)(1) (emphasis added). Unlike Section 2091.6, this regulation plainly requires publication of an order once the Secretary has exercised her discretion to approve an application for withdrawal. In Section 2310.3-3, the publication of the order is explicitly compelled. But, Section 2091.6 does not contain the same or similar language. And, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." <u>Camacho v. Bridgeport Financial Inc.</u>, 430 F.3d 1078, 1081 (9th Cir. 2005) (citation omitted). The same is true for agency

regulations.  That Section 2091.6 does not contain an explicit publication mandate is a clear indication that the agency did not intend to impose such a mandate upon the BLM.

There are times when publication in the Federal Register is a ministerial action as the State contends, but this is not one of those times.  For instance, in <u>Timken Company v. United States</u>, 715 F. Supp. 373, 374, 460 (CIT 1989), the court held that "19 U.S.C. § 1516a(e) (1982) created a clear obligation on the United States Department of Commerce, International Trade Administration (Commerce) to publish in the Federal Register notice of this Court's opinion in <u>Timken Co. v. United States</u>, 13 CIT 238, 714 F. Supp. 535, (1989), . . . within ten days of entry of such decision."  Section 1516a(e) provides, in relevant part, that "notice of [a] court decision shall be published within ten days from the date of the issuance of the court decision."  In <u>Comanche Nation, Oklahoma v. United States</u>, 393 F. Supp. 2d 1196, 1209 (W.D. Okla. 2005), the defendants argued that "the Secretary is required by statute, specifically, 25 U.S.C. § 2710(d)(8)(D), to publish notice in the Federal Register of any compact that is approved or considered to have been approved."  Section 2710(d)(8)(D) provides that "[t]he Secretary shall publish in the Federal Register notice of any Tribal-State compact that is approved, or considered to have been approved[.]"  The court agreed with the defendants that "the Secretary is required by § 2710(d)(8)(D) to publish approval of the compact[.]"  <u>Comanche Nation</u>, 393 F. Supp. 2d at 1209.

The difference between the two foregoing cases and this one is that the regulation at issue here, 43 C.F.R. § 2091.6, contains no mandate that the Secretary or the BLM shall

publish a public land order revoking a withdrawal once the order has been signed. Section 2091.6 does not require the BLM to take any discrete action once a PLO is signed. Thus, the State's unlawfully withheld claim in its Fourth Cause of Action is implausible, and it must be dismissed.

The State's Fifth Cause of Action is its unreasonably delayed APA claim. The State alleges that "a two-year delay to complete a purely ministerial action is unreasonable[,]" particularly when it follows "a decades-long history of unreasonable delays."[53] The State then refers to how many years have passed since ANCSA, ANILCA, and ALTAA were each enacted.[54] The State alleges that the two-year delay is unreasonable given that the "BLM itself has consistently identified" the 28 million acres of ANCSA Section 17(d)(1) "withdrawals as obsolete and appropriate for revocation since at least 2006."[55] The State seeks to have the court "issue an order compelling BLM to fulfill its non-discretionary duty by submitting PLO Nos. 7900, 7901, 7902, and 7903 to the Federal Register for publication and require that the incorporated opening orders be made effective no more than 30 days following publication."[56]

---

[53]Complaint for Declaratory and Injunctive Relief at 37, ¶ 169, Docket No. 1.

[54]Id. at 38, ¶¶ 170-172.

[55]Id. at 38, ¶ 173.

[56]Id. at 38, ¶ 174.

This claim is not plausible because, as discussed above, the BLM has no duty to publish the PLOs under 43 C.F.R. § 2091.6. Because the BLM has no duty to publish, there is no basis for the State's allegation that there has been an unreasonable delay. As the Ninth Circuit has explained, "an agency cannot unreasonably delay that which it is not required to do[.]" In re A Community Voice, 878 F.3d 779, 784 (9th Cir. 2017). Moreover, in this situation, the two-year delay is not patently unreasonable. The court is mindful that the Ninth Circuit has observed that "courts in this and other circuits have concluded that a reasonable time for agency action is typically counted in weeks or months, not years." In re Natural Resources Defense Council, Inc., 956 F.3d 1134, 1139 (9th Cir. 2020) (citation omitted). But, this case involves 28 million acres of land and potentially four or more issues that may need additional attention at the agency level. Taking two years to ensure that the revocations of the withdrawals at issue are proper, when the agency has no statutory or regulatory duty to act within a specific period of time, is not unreasonable.

## Conclusion

Defendants' motion to dismiss is granted. The State's complaint is dismissed without prejudice. The State is not given leave to amend as amendment at this point would be futile.

DATED at Anchorage, Alaska, this 14th day of March, 2022.

/s/ H. Russel Holland
United States District Judge